[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 23, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-10513

_____

D.C. Docket No. 92-14246-CV-NCR

WILLIAM H. KELLEY,

Petitioner-Appellee,

versus

SECRETARY FOR THE DEPARTMENT
OF CORRECTIONS, Secretary
Florida Department of Corrections,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 23, 2004)**

Before TJOFLAT, ANDERSON and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

The petitioner, William H. Kelley, is a Florida prisoner on death row,

having been convicted of first degree murder. The district court granted a writ of

habeas corpus setting aside his conviction and sentence.[1]  We reverse.

This case—from the time of the murder to the present—has spanned nearly thirty-eight years.  Understandably, its history is quite complicated.  For the readers' convenience, therefore, we preface the opinion with the following table of contents:

I.      Factual Background
        A.      The Maxcy Murder
        B.      John Sweet's Trial
        C.      Kelley's State Legal Proceedings
                1.      Kelley's Arrest
                2.      Kelley's Two Trials
                3.      Kelley's Direct Appeal
                4.      Kelley's Rule 3.850 Motion and Appeal
                5.      Kelley's Motion for Habeas Corpus Relief from the Florida
                        Supreme Court

II.     Federal Procedural History
        A.      Kelley's Federal Habeas Petition
        B.      Kelley's Federal Evidentiary Hearing
        C.      Disposition of Kelley's Federal Habeas Petition and Subsequent
                Developments

III.    Federal Evidentiary Hearing
        A.      Legal Standard for Permitting Federal Evidentiary Hearings
        B.      Application of the Legal Standard to Kelley's Case
                1.      The District Court's Failure to Ascertain the Appropriate Legal
                        Standard

---

[1]  The district court granted the writ on two grounds: (1) that the prosecutor denied the petitioner due process of law by withholding exculpatory evidence in violation of the rule laid down in Brady v. Maryland, 373 U. S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); and (2) that petitioner's attorneys denied him of his right to effective assistance of counsel at trial.

  2. The District Court's Failure to Apply Any Legal Standard

IV. Rulings on Habeas Claims
  A. Ineffective Assistance of Counsel
    1. The Exhaustion Requirement
    2. Application of the Exhaustion Requirement to Kelley's Case
    3. Kelley's Lack of Prejudice from Ineffective Assistance
  B. Prosecutorial Misconduct
    1. The <u>Brady</u> rule
    2. Application of the <u>Brady</u> Rule to Kelley's Case
      a. The Massachusetts Immunity Order and the Joe Mitchell Report
      b. Transcript of John Sweet's First Trial
      c. Roma Trulock Report
      d. Fingerprint Report
    3. Conclusion Regarding <u>Brady</u> Claims

V. Conclusion

I.
Factual Background

A. The Maxcy Murder

This sordid tale begins with an illicit love affair between John Sweet, a real estate broker with shadowy ties to Boston's criminal underworld, and Irene Maxcy, who was married to Charles von Maxcy ("Maxcy"), a wealthy citrus grower. It culminates in Maxcy's assassination at the hands of two hit men. The investigation and legal proceedings following the murder have spanned almost four decades and have involved some of the best known lawyers in the country.

The district court described the circumstances leading up to and surrounding

3

Maxcy's murder as follows:

> Irene Maxcy and John Sweet were lovers, and they planned to kill Irene's husband, Charles von Maxcy, a wealthy citrus grover [sic] and rancher from Sebring, Florida. Sweet and Irene talked for months about the murder, after which they planned to live together on Maxcy's large estate. Sweet contacted an acquaintance, William Bennett of Boston, Massachusetts. Arrangements were made, and a price was set: $5000 up front, and $15,000 after the murder.

> On October 1, 1966, Sweet went to Daytona, Florida to meet Andrew von Etter. Von Etter was to do the killing, along with a partner. The next day von Etter called Sweet to tell him the partner, "William Kelley", had arrived. On October 3rd, Sweet drove von Etter and "Kelley" to the estate. The alleged killers showed Sweet the weapons they would use, knives and a revolver, which they kept in a satchel. Sweet drove back to Sebring. Charles von Maxcy was murdered that day. A couple weeks later, Sweet went to Boston to pay the $15,000 balance due for the murder.

> Unfortunately, the murder did not signal the beginning of a blissful life on the estate for Irene Maxcy and John Sweet. Sweet wanted more money, purportedly to pay off the murder balance, and he began to harass and threaten Irene and her five-year-old daughter daily. Terrified, Irene Maxcy went to the authorities. In exchange for immunity, she implicated Sweet in the murder-for-hire scheme.

Kelley v. Sec'y for the Dep't of Corr., No. 92-14246 at 1-2 (S.D. Fla. Sept. 19, 2002) (order granting habeas relief on claim (1)). Before Irene Maxcy came forward, a comprehensive investigation was underway. Special Agent Roma Trulock of the Florida Department of Law Enforcement ("FDLE") headed that investigation and interviewed potential eye witnesses. In particular he spoke with

4

Kaye Carter, who met Kelley and Von Etter around the time of the murder at the

Daytona Inn Motel, where the prosecution says the hit men lodged before they

drove to Sebring to kill Maxcy.

B.    John Sweet's Trial

Sweet was tried in the Circuit Court of Polk County, Florida.  As the district

court explained,

> Sweet was arrested in 1967, charged with first degree murder.  It
> became known in the course of the investigation for Sweet's trial that
> the "triggermen" in the murder were named von Etter and "Kelley".
> These men were not charged at this time, however, as prosecutors felt
> they had insufficient evidence against them.
>
> Irene Maxcy was the star witness for the prosecution in Sweet's first
> trial.  Her testimony was erratic and difficult as she denied, even
> under the protection of immunity, that she wanted to kill her
> husband.  She testified it was entirely Sweet's idea.  She claimed to
> have witnessed many of the phone calls Sweet had made in arranging
> the murder, and she related many of the details about which Sweet
> had kept her informed, including the murder itself.  She further
> testified that she gave Sweet more than $35,000 to help pay for the
> murder, and that Sweet had wanted another $75,000.  Sweet,
> testifying on his own behalf, denied any involvement in the crime.

Id. at 2-3.  Sweet also launched a vitriolic character assault on Irene Maxcy,

accusing her of partaking in a host of deviant sex acts.  The trial ended in a hung

jury.

In 1986, Sweet was tried a second time.  Irene Maxcy testified against him

again, and, again, Sweet denied any involvement in the murder. This time, however, Sweet was convicted of first degree murder and sentenced to life in prison.

Unfortunately, the second trial proceedings were tainted by an evidentiary irregularity. Sweet's defense team repeated their earlier attacks on the credibility of both Irene Maxcy and another important witness against Sweet: Roma Trulock, the primary investigator for Maxcy's murder. Sweet v. State, 235 So. 2d 40, 41 (Fla. 2d Dist. Ct. App. 1970). Defense counsel believed that Irene Maxcy and Trulock were engaged in a romantic relationship and, therefore, that Trulock had an interest in seeing Sweet incarcerated. To determine whether Irene Maxcy and Trulock would admit to the affair, the court permitted defense counsel to examine them outside the presence of the jury. Trulock denied the allegation vehemently, but Irene Maxcy did not. Irene Maxcy testified, among other things, that she and Trulock had engaged in sexual intercourse and that Trulock had expressed a desire to get Sweet convicted so that she and Trulock could take a trip to "the Islands." Id. at 41-42. The court excluded such testimony, sustaining the State's objection. Following his conviction, Sweet challenged the court's ruling on appeal. Id. at 40-41. In a two-to-one decision, the district court of appeal reversed Sweet's conviction and awarded a new trial. Id. at 42. In the court's view, "the proffered

6

cross-examination in question went directly to undermine the very foundation of the State's case, i.e., the credibility of Irene Maxcy and C. R. Trulock. Its exclusion was a substantial frustration of [Sweet's] right to effective cross-examination . . . ." Id.

After this ruling, Sweet's defense, citing Florida's speedy trial rules, filed a motion to discharge Sweet from prosecution. The state conceded that it could not proceed against Sweet again because key witnesses had become unavailable. On November 16, 1971, the circuit judge who had presided over Sweet's case found that he had "no course other than to grant the motion." Commending the efforts of the prosecution, the judge—in his own words—"reluctantly" ordered that Sweet "stand[s] discharged from further prosecution . . . ."

In April of 1976, the state attorney petitioned the circuit court to enter an order authorizing the clerk of the court to destroy certain physical evidence held for Sweet's prosecution. The court granted that petition, and several articles of evidence, including a bullet, a bloody bed sheet, and a shred from the victim's shirt, were destroyed.

Sweet had gotten away with murder, but his role in the prosecutor's pursuit of the matter had not ended. As the district court observed, after his conviction was reversed,

7

> John Sweet wasted little time in matriculating back into the underworld. By 1981, Sweet was facing charges in Massachusetts of prostitution, narcotics distribution, arson, bribery, counterfeiting, loan sharking, and hijacking, among other things. With authorities closing in on him, Sweet went to them first. His plan was to win immunity in exchange for information he had on the murder of Charles von Maxcy. William Kelley was the target, as Sweet implicated him as one of the murderers. The Massachusetts authorities brought Sweet to Florida where Sweet gave authorities there his confession. The next day Sweet was awarded immunity in Massachusetts.

Kelley v. Sec'y for the Dep't of Corr., No. 92-14246 at 4 (S.D. Fla. Aug. 31, 2000) (order denying habeas claims (4)-(6)). On December 16, 1981, a Highlands County grand jury indicted the petitioner, William H. Kelley, for first degree murder.

C.    Kelley's Arrest and Prosecution

1.    Kelley's Arrest

William H. Kelley was arrested on June 16, 1983, roughly seventeen years after Maxcy's murder. By that time, Walter Bennett, who was Sweet's contact for the murder contract, and Andrew von Etter, who was Kelley's supposed partner in the killing, were both dead. Irene Maxcy, of course, had immunity for her role in the murder.

Three special agents of the FBI apprehended Kelley at a motel in Tampa, Florida. They had received a tip that a guest of the motel met Kelley's description.

8

One of the agents, Ross Davis, testified at Kelley's trial that the FBI sought and arrested Kelley for "[u]nlawful flight to avoid prosecution" in North Carolina. The agents did not realize that Kelley was wanted for murder in Florida until they took him back to their Tampa office and conducted a background check. When Davis finally informed Kelley of his indictment for the Maxcy murder, Kelley made statements indicating knowledge of the crime and suggested that the State would never be able to obtain a conviction. These statements eventually became a subject of dispute at Kelley's trial.

2.      Kelley's Two Trials

Kelley enlisted the assistance of several attorneys in preparing his case for trial. He was represented initially by Robert E. Dinsmore of Boston and Ronald K. Cacciatore of Tampa. On October 20, 1983, however, Kelley, acting pro se, filed a document entitled "Discharge of Attorneys," which stated that Dinsmore and Cacciatore were no longer authorized to act on Kelley's behalf and that new counsel would begin representing him immediately. Kelley explained that this decision was in his best interest and was made without coercion or pressure from Dinsmore and Cacciatore. The same day, Nicholas G. Schommer, a lawyer practicing in Sebring,[2] moved the court to permit Dinsmore and Cacciatore to

---

[2] Sebring is the county seat of Highlands County, Florida.

9

withdraw as Kelley's counsel. The court granted the motion.

On December 7, Schommer filed a notice of appearance, stating that he would act as Kelley's local counsel and that Kunstler and Mason, a New York law firm, would serve as Kelley's primary counsel. William Kunstler and Mark Gombiner, partners of the firm, moved the court on December 8 for leave to appear pro hac vice. The court granted their motion on December 20.

Sometime between December 20, 1983 and January 12, 1984, Jack Edmund of Bartow, Florida, joined Kunstler and Gombiner as part of Kelley's defense team.[3] Kunstler testified later[4] that he first met Edmund and, in fact, first learned of Edmund's role in the defense on January 12, 1984, when Kunstler came to Sebring to argue pretrial motions.

Prior to trial, Kelley's defense team also included a paralegal named Harvey Brower. Brower was formerly a Massachusetts lawyer, but as the district court explained,

> Brower was disbarred from the practice of law in Massachusetts in August, 1979, for defrauding one of his clients. In re: Harvey Brower, No. 79-14BD (Mass. Aug. 16, 1979). Earlier in his

---

[3] Edmund did not file his notice of appearance as Kelley's co-counsel, however, until January 23, 1984.

[4] On July 18, 1988, Kunstler testified at the evidentiary hearing the circuit court held on Kelley's motion to vacate his conviction and sentence under Florida Rule of Criminal Procedure 3.850.

10

Massachusetts legal career, Brower was censured by its Supreme Judicial Court for fraudulent conduct in negligence cases. In re Harvey Brower, No. 29871 Law (Mass. Feb. 23, 1973). Brower also was convicted in the Western District of Louisiana for unlawfully conspiring to aid and abet the crime of bail jumping. United States v. Marino, 617 F.2d 76, 78 (5th Cir. 1980).

Kelley v. Sec'y for the Dep't of Corr., No. 92-14246 at 6, 7 (S.D. Fla. Dec. 30, 2002) (order denying habeas claim (3) but granting relief on claim (2)) (footnote omitted). The district court further noted that Brower's law office had also been involved in a counterfeit bond sale conspiracy. Brower's conduct in the course of Kelley's defense eventually played a critical role in the district court's conclusion that Kelley suffered ineffective assistance of counsel. It is not entirely clear how or when Brower became involved in the case. The record permits the inference that Brower arrived on the scene around the time Kelley decided to discharge Dinsmore and Cacciatore as his counsel. It is equally plausible, however, that Brower's services were first employed at Kelley's request even before Dinsmore was hired.

At the hearing the circuit court held in July 1988 on Kelley's Rule 3.850 motion to vacate conviction and sentence, Kunstler testified that Brower was the one who first contacted him about participating in Kelley's defense. In fact, Kunstler never met Kelley until he went to Sebring on January 12, 1984 for a

11

motions hearing. Kunstler was under the impression that Brower had represented Kelley on other matters in the past and that Brower would be preparing the case and virtually all of the pretrial motions. Kunstler expected that his own role would be confined to trial counsel alone, and he was not initially concerned with the amount of responsibility that would be entrusted to Brower. Kunstler expressed a great deal of confidence in Brower's ability despite the disbarment, and he regarded Brower as both an "excellent" lawyer and investigator. In fact, when Kunstler missed a hearing on pretrial motions, he recommended that the nonlicensed Brower argue the motions in his stead.[5]

Kelley's trial began in January of 1984. By that time, Brower had disappeared. As the federal district court later observed, "Kunstler characterized Brower as a thief who 'absconded' with fees without ever performing his investigatory duties." Kelley, No. 92-14246 at 7 (S.D. Fla. Dec. 30, 2002). Kunstler and Edmund were the dominant players in Kelley's defense.[6] Kunstler took primary responsibility for many of the most important trial tasks, including

---

[5] Of course, the court did not permit Brower to appear as an attorney. The court first requested that Schommer argue the motions. Schommer indicated that he was only local counsel and was not prepared to argue. Consequently, the court required Schommer to argue only the motions he could handle and then recessed the hearing until the following day, when Kunstler would be available, to consider the remaining motions.

[6] The record does not reveal the extent of Gombiner's participation, if any.

12

the cross-examination of the state's star witness, John Sweet. The jury was unable to reach a verdict, and on January 30, the court declared a mistrial.

The state decided to prosecute Kelley again. With Brower gone, the defense enlisted the assistance of a investigator in Edmund's office to do some additional work in preparation for the retrial.[7]

Kelley's second trial commenced on March 27. Again, Kunstler and Edmund shared the major responsibilities for Kelley's defense, but Edmund played a more significant role in the second proceeding. In particular, the task of cross-examining John Sweet now fell to Edmund. This important responsibility included impeaching Sweet's testimony about a conversation he had with Kelley years after the murder, in which Kelley allegedly told Sweet, "I stabbed [Maxcy] three or four times and he kept coming after us, so I had to shoot him in the head." Kelley v. State, 486 So. 2d 578, 580 (Fla. 1986). One of the State's other key witnesses was Abe Namia, a private investigator hired by Sweet's defense team when Sweet was being prosecuted. Namia's testimony corroborated Sweet's and was admitted to rebut the inference that Sweet recently fabricated his version of the story. Id.

At the conclusion of the State's case, the defense moved for judgment of

---

[7] The investigator, Richard Mars, was a lawyer licensed to practice in Florida.

acquittal. The court denied the motion. The defense then rested without introducing any evidence. This decision entitled the defense to make the first and last closing arguments to the jury.[8] When asked at the evidentiary hearing on Kelley's Rule 3.850 motion whether he considered the defense's decision to rest without putting on a case "to be a matter of trial strategy," Edmund responded, "Of course." He characterized the decision as a no-brainer in Kelley's case, and he suggested that any good defense lawyer would have adopted the same approach.

On March 30, the jury found Kelley guilty of first degree murder. At the end of the sentencing phase of the trial, a majority of the jury recommended that he receive the death penalty. On April 2, consistent with the jury's recommendation, the court sentenced Kelley to death.

### 3. Kelley's Direct Appeal

Kelley appealed his conviction and sentence to the Florida Supreme Court. Kunstler and Edmund appeared on Kelley's initial brief, which challenged several of the trial court's rulings. Specifically, Kelley contended that:

(1) The court should have dismissed his indictment because the

---

[8] At the time of Kelley's trial, Fla. R. Crim. P. 3.250 provided that "a defendant offering no testimony in his own behalf, except his own, shall be entitled to the concluding argument before the jury." Customary practice under this rule is to have three arguments; the defendant opens and closes, and the prosecution is sandwiched in the middle.

destruction of physical evidence after Sweet's second trial violated Kelley's due process rights.

(2) The court should have excluded Abe Namia's testimony regarding a conversation between Namia and Sweet in 1967.

(3) The court erred by refusing to answer a question posed the jury during its deliberations. In particular, the jury asked "if John J. Sweet received immunity in Florida for 1st Degree murder and perjury before he gave information on the Maxcy trial and if he had anything to gain by his testimony[.]"

(4) The court erred in allowing the jurors to take notes.

(5) The court erred in admitting statements Kelley made to the FBI agents who apprehended him indicating Kelley's knowledge about the Maxcy murder at the time of his arrest.

(6) Florida's statute governing the proceedings for issuing death sentences is facially unconstitutional and, in any event, was improperly applied by the court.

In addition to the brief Kunstler and Edmund filed, the supreme court allowed Kelley to file a supplemental brief prepared by Barry Haight, a

15

Massachusetts lawyer, and Donald Ferguson, a Florida lawyer.[9]  Beyond the

arguments advanced by Kunstler and Edmund, the supplemental brief asserted that

the court gave improper, nonstandard jury instructions—in particular, an <u>Allen</u>

charge[10]—which might have coerced the jury to overcome an impasse.

Significantly, the supplemental brief also claimed that Kunstler and Edmund were

ineffective and, therefore, deprived Kelley of his right to effective assistance of

counsel under the Sixth Amendment.  In support of this claim, the supplemental

brief cited (1) counsels' failure to prepare pretrial motions properly; (2) counsels'

failure to move the court to dismiss the indictment due to the State's destruction of

evidence after Sweet's second trial; (3) Kunstler's failure to appear in Sebring on

January 11 at the hearing the court had scheduled for Kelley's pretrial motions and

his ostensible willingness to allow Brower to argue those motions; (4) counsels'

failure to object to the court's <u>Allen</u> charge; and (5) counsels' failure to object to

the court's refusal to answer the jury question described above.

The supreme court rejected all of Kelley's arguments.  <u>Kelley</u>, 486 So. 2d at

586.  It also explained that Kelley's ineffective assistance claim could not be

resolved on "the record as it stands."  <u>Id.</u> at 585.  That claim could be raised,

---

[9]  From all we can tell, this was Haight and Ferguson's first appearance in the case.

[10]  <u>See</u> <u>Allen v. United States</u>, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896).

however, in a collateral motion for postconviction relief.  Id.

With the assistance of Alan Dershowitz, a Harvard Law School professor, Kelley petitioned the United States Supreme Court for a writ of certiorari.  The Court denied the writ on October 6, 1986.  Kelley v. Florida, 479 U.S. 871, 107 S. Ct. 244, 93 L. Ed. 2d 169.

4.      Kelley's Rule 3.850 Motion and Appeal

In 1987, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure,[11] Kelley moved the trial court (the "Rule 3.850 court") to vacate his conviction and sentence.  At this stage, Kelley was represented by Barry Wilson, a Boston lawyer, and James Green, who practiced in West Palm Beach.  The motion alleged that the State had denied Kelley due process of law for the following reasons:  (1) the State destroyed certain tangible exhibits introduced into evidence during Sweet's prosecution; (2) due to the destruction of these exhibits, defense counsel could not

---

[11]  The version of Rule 3.850 in effect during the collateral proceedings in this case provided, in relevant part:

> A prisoner in custody under sentence of a court established by the laws of Florida claiming the right to be released upon the ground that the judgment was entered or that the sentence was imposed  in violation of the Constitution or Laws of the United States, or of the State of Florida, or that the court was without jurisdiction to enter such judgment or to impose such sentence or that the sentence was in excess of the maximum authorized by law, or that his plea was given involuntarily, or the judgment or sentence is otherwise subject to collateral attack, may move the court which entered the judgment or imposed the sentence to vacate, set aside or correct the judgment or sentence.

17

effectively cross-examine the State's expert witness who testified about them; (3) the prosecution illegally suppressed numerous items of exculpatory evidence; (4) the prosecution improperly interfered with defense counsel's cross-examination of Abe Namia; (5) the prosecutor's closing argument to the jury contained intentional misstatements of fact; and (6) Kunstler and Edmund deprived Kelley of effective assistance of counsel.[12]

The Rule 3.850 court held an evidentiary hearing on two issues: "1) whether the prosecution suppressed evidence favorable to the defendant [claim (3)], and 2) whether the defendant was denied effective assistance of counsel [claim (6)]." After receiving the parties' evidence, the court made written findings of fact and conclusions of law and denied Kelley's motion. The Florida Supreme Court, largely adopting those findings and conclusions, affirmed. Kelley v. State, 569 So. 2d 754, 762 (Fla. 1990). Responding to claim (1), the court found that "[t]he state was not at fault in the destruction of the evidence" and therefore did not deny Kelley of due process of law. Id. at 756. The court found that claims (4) and (5)

---

[12] This sixth claim is described in considerable detail in Part IV.A.2, infra, where we address the district court's issuance of the writ on a claim Kelley did not present to the Rule 3.850 court, to wit: that Kunstler and Edmund denied Kelley his Sixth Amendment right to effective assistance of counsel when they relied on Brower to conduct the pretrial investigation.

were barred because they were not cognizable in a Rule 3.850 proceeding.[13]  Id.

Although the supreme court did not say so in its opinion, the Rule 3.850 court

correctly found claim (2) barred for a similar reason:  "The admission of evidence

and testimony at trial is clearly a matter which could have been raised on appeal."

In rejecting claims (3) and (6), the supreme court quoted the lower court's

reasoning.  Turning to claim (3), the court addressed all of the items the State had

withheld from the defense and concluded that each was either legally immaterial or

sufficiently available to defense counsel.

The court distilled Kelley's claim of ineffective assistance of counsel, claim

(6), into seven discreet instances.  The court responded to each, finding that every

alleged instance of ineffective assistance was the result of trial strategy, was legally

immaterial, or otherwise was not supported by the evidence presented at the Rule

3.850 hearing.  The court concluded that both Kunstler and Edmund were "capable

and effective" in their defense of Kelley.  Id. at 761.

> 5.  Kelleys' Motion for Habeas Corpus Relief from the Florida Supreme Court

Kelley's final attempt to seek relief in the state court system was a petition to

---

[13]  The bases for claims (4) and (5) were contained in the record of the proceedings in Kelley's criminal prosecution; therefore, those claims should have been raised on direct appeal. Rule 3.850 permits collateral attack on a sentence and conviction.  It is not a vehicle for relitigating claims that were cognizable on direct appeal—whether or not those claims were actually raised and decided on direct appeal.

the Florida Supreme Court for a writ of habeas corpus. In that petition, Kelley raised three claims: "(1) his appellate counsel [were] ineffective; (2) the application of the death penalty statute to this crime is ex post facto; and (3) the aggravating factors [supporting his death sentence] of pecuniary gain and cold calculated, and premeditated are overbroad." Kelley v. Dugger, 597 So. 2d 262, 263 (Fla. 1992) (emphasis added). On March 12, 1992, the court rejected each of these claims and denied Kelley's petition. Id. at 265.

II.
Federal Procedural History

A.    Kelley's Federal Habeas Petition

On October 9, 1992, Kelley, represented by Laurence Tribe, a Harvard Law School professor, and Barry Wilson, petitioned the United States District Court for the Southern District of Florida for a writ of habeas corpus. See 28 U.S.C. § 2254. The petition, nearly 300 pages in length (not counting attached exhibits), asserted six bases for relief:

(1) prosecutorial misconduct, including deliberate misstatements to the jury and the suppression of exculpatory evidence;

(2) ineffective assistance of trial counsel, including "failure to investigate, to depose witnesses, to present a case in defense, and to

20

perform other basic defense functions";

(3) deprivation of Kelley's Sixth, Eighth, and Fourteenth Amendment rights through the destruction of evidence following John Sweet's second trial;

(4) improper admission at trial of Abe Namia's testimony;

(5) improper admission at trial of statements Kelley made to FBI Special Agent Ross Davis at the time of his arrest; and

(6) unconstitutional imposition of the death sentence.

Kelley's petition contained a demand for an evidentiary hearing.

On August 31, 2000, the court issued an order denying claims (4), (5), and (6). The court concluded that those claims could be decided on the basis of the record of the proceedings in the trial stage of Kelley's prosecution. In the same order, the court deferred its decision on claims (1), (2), and (3) until it decided whether an evidentiary hearing on those claims was necessary. Kelley, No. 92-14246 at 29 (S.D. Fla. Aug. 31, 2000). On November 22, 2000, over eight years after Kelley filed his petition, the district court granted him an evidentiary hearing on the remaining claims over the State's repeated objections.

B.     Kelley's Federal Evidentiary Hearing

The district court decided to hold an evidentiary hearing before it resolved

three claims: (1) that the prosecution deprived Kelley of due process by suppressing exculpatory evidence; (2) that Kelley was prejudiced by ineffective assistance of counsel; and (3) that the destruction of evidence following Sweet's second trial deprived Kelley of due process of law. The hearing commenced on April 24, 2001. Attorneys James C. Lohman[14] of Tallahassee, Florida and Joseph Oteri of Boston, Massachusetts appeared on Kelley's behalf. Carol Dittmar appeared for the State. In total, Kelley's attorneys called eleven witnesses; the State called two.

The first two days of the hearing were held in Boston. Kelley presented the testimony of eight witnesses,[15] one of whom was co-counsel Joseph Oteri.[16] The

---

[14] Lohman came to represent Kelley after another series of attorney substitutions. On March 30, 1993, Barry Wilson filed a motion to withdraw from Kelley's case. The court entered an order substituting Donald Ferguson for Wilson on June 5. Unfortunately, Ferguson did not stay with Kelley throughout the habeas proceedings either. He filed his motion to withdraw on August 8, 1995. On August 29, the court granted that motion "to the extent that Mr. James C. Lohman will be substituted as counsel of record for Mr. Donald L. Ferguson."

[15] One of the witnesses testified via videotape.

[16] Oteri testified concerning a material issue: whether Harvey Brower's conduct operated to deny Kelley effective assistance of counsel. Oteri testified, in part, as follows:

> I wouldn't have entrusted Harvey [Brower] with 10 cents. He was totally incompetent as far as paying attention to details. He did absolutely nothing—he did the minimal amount of work he could do. And in this particular case, for Bill Kunstler, whom I had knew and had worked with, to entrust Harvey [Brower] with the preparation of a capital case is a mortal sin as well as incompetence.

After testifying to an issue on which the district court eventually granted habeas relief, Oteri participated in the evidentiary hearing as Kelley's co-counsel. Rule 3.7(a) of the Model Rule of

22

third day of the hearing was held on July 9 in Ft. Pierce, Florida. At that time,

Kelley called three additional witnesses. The same day, the State called both of its

witnesses, one being Edmund. Twelve of the thirteen individuals who testified at

the evidentiary hearing had not testified at the Rule 3.850 hearing in state court.

Only Edmund testified at both hearings.

C.       Disposition of Kelley's Federal Habeas Petition and Subsequent
         Developments

On September 19, 2002, the court issued an order granting Kelley relief on

claim (1). Based in part on testimony adduced at the evidentiary hearing, the court

concluded that Kelley was entitled to a new trial because the State had withheld

material exculpatory evidence in derogation of the rule laid down in Brady v.

Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Kelley, No. 92-

14246 at 23-24 (S.D. Fla. Sept. 19, 2002). Having granted Kelly relief on this

claim, the court apparently thought it unnecessary to rule on Kelley's two

Professional Conduct provides that

> A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a
> necessary witness unless:
> (1) the testimony relates to an uncontested issue;
> (2) the testimony relates to the nature and value of legal services rendered in the
> case; or
> (3) disqualification of the lawyer would work substantial hardship on the client.

The record is silent as to whether Oteri, opposing counsel, or the district court were aware of this
ethical provision. What we do know is that after testifying, Oteri did not withdraw from active
participation in the habeas proceeding.

23

remaining claims, (2) and (3). Acting pursuant to the September 19 order, the clerk

entered a final judgment and closed the case the same day.

On September 30, 2002, the State filed a motion to alter or amend the

judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.[17] The

State supported its motion with two arguments. First, citing Clisby v. Jones, 960

F.2d 925 (11th Cir. 1992), the State argued that the district court should have ruled

on claims (2) and (3) as well as claim (1). Second, the State argued that the court

should revise its disposition of claim (1) to correct clear error and prevent manifest

injustice. In the State's view, the court reached its decision only by disregarding

important testimony and failing to give due deference to the findings of the state

courts.

The district court disposed of the State's motion in an order issued on

December 30, 2002. Kelley, No. 92-14246 (S.D. Fla. Dec. 30, 2002). Answering

_____

[17] In relevant part, Rule 59 provides,

(a) Grounds. A new trial may be granted to all or any of the parties and on all or
part of the issues . . . in an action tried without a jury, for any of the reasons for
which rehearings have heretofore been granted in suits in equity in the courts of
the United States. On a motion for a new trial in an action tried without a jury, the
court may open the judgment if one has been entered, take additional testimony,
amend findings of fact and conclusions of law or make new findings and
conclusions, and direct the entry of a new judgment. . . .

(e) Motion to Alter or Amend Judgment. Any motion to alter or amend a
judgment shall be filed no later than 10 days after entry of the judgment.

24

the State's second argument first, the court declined to alter or amend its judgment on claim (1). The court agreed with the State, however, that it should have ruled on the two undecided claims.

Turning to claim (2), the court found that Kelley was entitled to habeas relief because his trial counsel was ineffective. The court reasoned that Kelley's defense counsel had "a duty to make reasonable investigations or to make a reaonable decision that makes particular investigation unnecessary[,]" but had met neither obligation. Id. at 7 (citing Strickland v. Washington, 466 U.S. 668, 691, 104 S. Ct. 2052, 2066, 80 L. Ed. 2d 674 (1984)). In the court's view, Harvey Brower, who was responsible for pretrial investigation, was incompetent, and Kelley's primary defense counsel, Kunstler and Edmund, did not know that Brower had failed them. As the court stated in its order,

> Kelley's trial counsel was deficient in having a disbarred attorney, lazy to a fault, resolve whether or not to conduct a pretrial investigation. . . . [T]rial counsel in the present case acted under the mistaken belief that Brower would perform a dutiful investigation or decide not to investigate after thoughtful consideration.

Id. at 9. After finding that counsel's performance fell short of the Sixth Amendment's standard for effective assistance of counsel, the court neglected to say how, if at all, counsel's ineffectiveness prejudiced Kelley. The court also failed to mention the other instances of ineffective assistance of counsel that Kelley

25

asserted in his petition.

The court found no merit in claim (3) because Kelley failed to show that the State had acted in bad faith when it destroyed the exhibits introduced into evidence during Sweet's prosecution.

On January 28, 2003, the State initiated the appeal now before us. The appeal calls into question the correctness of the orders the district court entered on September 19, 2002 (granting habeas relief on claim (1)) and December 30, 2002 (granting relief on claim (2)).[18] Kelley does not cross-appeal the district court's denial of claims (3), (4), (5), and (6) or its partial denial of claim (2).

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

### III.
### Federal Evidentiary Hearing

Before proceeding to the merits of the district court's rulings, we first address the question of whether the court abused its discretion in granting Kelley an evidentiary hearing so that he could present evidence to it that was not presented to the state courts. We review a district court's decision to grant or deny an evidentiary hearing for abuse of discretion. See Hall v. Head, 310 F.3d 683, 690 (11th Cir. 2002); cf. Mathis v. Zant, 975 F.2d 1493, 1497 (11th Cir. 1992)

---

[18] The State did not appeal the district court's partial denial of its Rule 59(e) motion to alter or amend its September 19 judgment.

(vacating grant of habeas relief and remanding for cause-and-prejudice hearing where the district court, without identifying its authority to do so and despite respondent's objections, permitted petitioner to develop evidence never presented to the state court). A district court abuses its discretion if it misapplies the law or makes findings of fact that are clearly erroneous. Ambrosia Coal and Constr. Co. v. Morales, 368 F.3d 1320, 1332 (11th Cir. 2004) (citations omitted).

A.     Legal Standard for Permitting a Federal Evidentiary Hearings

The legal standard for determining the scope of a district court's discretion to hold an evidentiary hearing in a habeas corpus case depends on whether the case is subject to the Antiterrorism and Effect Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). Where AEDPA applies, the standard is articulated in 28 U.S.C. § 2254(e)(2). In pre-AEDPA cases, the standard was first set forth in Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), and clarified in subsequent decisions, including most prominently Keeney v. Tamayo-Reyes, 504 U.S. 1, 112 S. Ct. 1715, 118 L. Ed. 2d. 318 (1992).

Beginning with pre-AEDPA cases, the Supreme Court held in Townsend that district courts are required to grant evidentiary hearings to state prisoners when any of the following six circumstances applies:

(1) the merits of the factual dispute were not resolved in the state

27

hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

372 U.S. at 313, 83 S. Ct. at 757. The Court emphasized that these six circumstances merely enumerated the cases in which an evidentiary hearings is mandatory. The circumstances in which an evidentiary hearing is authorized were considerably broader. Indeed, the Court indicated that district judges have "discretion" to hold evidentiary hearings in "all" cases, even where the petitioner "was afforded a full and fair hearing by the state court resulting in reliable findings . . . ." Id. at 318, 83 S. Ct. at 760. The Court elaborated,

In every case [the district judge] has the power, constrained only by his sound discretion, to receive evidence bearing up the applicant's constitutional claim. There is every reason to be confident that federal district judges, mindful of their delicate role in the maintenance of proper federal-state relations, will not abuse that discretion.

Id.

Three years after the Townsend decision came down, Congress amended the habeas statute. Among these amendments, Congress established a statutory presumption according deference to state-court factfindings except under eight enumerated exceptions, which roughly paralleled Townsend's tests for determining

28

when district courts must grant an evidentiary hearing.[19]  Where none of these

[19]  The relevant statute, which has since been comprehensively amended, then provided as follows:

> In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
>> (1) that the merits of the factual dispute were not resolved in the State court hearing;
>> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
>> (3) that the material facts were not adequately developed at the State court hearing;
>> (4) that the State court lacked jurisdiction of the subject matter or over the person of the appellant in the State court proceeding;
>> (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
>> (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
>> (7) that the applicant was otherwise denied due process of law in the State court proceeding;
>> (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:
> And in an evidentiary haring in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

exceptions applied, the amended statute increased the burden petitioners had to meet to override state factfindings. Where state factfindings were presumed correct, the petitioner had to establish the state court's error by "convincing evidence"; where state factfindings were not presumed correct (because one of the statute's exceptions applied), the petitioner had to establish the facts necessary to support his claim by only a preponderance of the evidence. Keeney, 504 U.S. at 20, 112 S. Ct. at 1726 (O'Connor, J., dissenting) (quoting Sumner v. Mata, 449 U.S. 539, 551, 101 S. Ct. 764, 771, 66 L. Ed. 2d 722 (1981)). Thus, although district courts still could, within the limits of their "sound discretion," Townsend, 372 U.S. at 318, 83 S. Ct. at 760, grant evidentiary hearings when Townsend's tests were not met, they could not overlook the elevated deference accorded state factfindings unless an exception to the revised statute applied.

In 1992, the Supreme Court revisited the issue of federal evidentiary hearings and overruled Townsend in part. In Keeney, the Court reconsidered the fifth circumstance in which Townsend entitled a petitioner to an evidentiary hearing, namely, when material facts were not adequately developed in the state courts. The Court held that a habeas petitioner is "entitled to an evidentiary

_____

28 U.S.C. § 2254(d), subsequently amended by Antiterrorism and Effect Death Penalty Act (AEDPA) of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996).

hearing if he can show <u>cause</u> for his failure to develop the facts in state-court proceedings and <u>actual prejudice</u> resulting from that failure." <u>Keeney</u>, 504 U.S. at 11, 112 S. Ct. at 1721 (emphasis added). Alternatively, the petitioner is permitted to develop additional facts at the federal level if he could "show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing." <u>Id.</u> at 12, 112 S. Ct. at 1721. The Supreme Court explained that this rule limiting the availability of federal evidentiary hearings was motivated not only by considerations of judicial economy, but also by those of comity to state courts, accuracy and finality of state court judgments, and consistency in habeas corpus jurisprudence. <u>Id.</u> at 8-9, 112 S. Ct. at 1719-20.

A majority of the Court did not specify whether <u>Keeney</u>'s revision of the law defined the conditions in which federal evidentiary hearings were <u>mandatory</u> or, rather, the outer boundaries of when they were <u>permissible</u>. <u>But see id.</u> at 23, 112 S. Ct. at 1727 (O'Connor, J., dissenting) ("[T]he district courts . . . still possess the discretion, which has not been removed by today's opinion, to hold [evidentiary] hearings even where they are not mandatory."). We confronted that issue, however, in <u>Mathis v. Zant</u>, 975 F.2d 1493 (11th Cir. 1992). There, "the district court, on its own initiative, permitted [the] petitioner to introduce additional evidence to bolster his claim of ineffective assistance of counsel at sentencing by

31

developing and submitting evidence never presented to the state court that first addressed this claim." Id. at 1497. After considering the newly developed evidence, the court granted relief on the ineffective assistance ground.[20] Id. We observed that, despite the respondent's numerous objections, the district court never identified its authority for holding an evidentiary hearing on its own initiative. Id. Consequently, we vacated the district court's judgment and remanded, instructing the court

> (1) to articulate its ground or grounds for circumventing the presumption of correctness accorded a state court's factual findings under [pre-AEDPA] 28 U.S.C. § 2254(d) by sua sponte permitting petitioner to submit additional evidence on his claim of ineffective assistance of counsel at sentencing, [and] (2) to determine whether petitioner can demonstrate cause and prejudice for failing to present to the state courts the supplemental evidence submitted to the district court . . . .

Id. (citing Keeney, 504 U.S. 1, 112 S. Ct. 1715).

Arguably, this holding could be narrowly read to require satisfaction of Keeney's cause-and-prejudice test only where a district court elects to hold an evidentiary hearing absent motion of the petitioner. But we later resolved any doubt as to the necessity of applying Keeney's test to all cases in Weeks v. Jones, 26 F.3d 1030, 1043 (11th Cir. 1994). There we held unequivocally, "Without a

---

[20] It also granted relief on other grounds, but they are of no consequence here.

cause and prejudice showing for evidence not submitted to the state court, a habeas petitioner is procedurally barred on federal habeas review just as he is from presenting new claims not previously before the state court." Id. at 1043; see also Mitchell v. Rees, 114 F.3d 571, 577 (6th Cir. 1997) (holding that under pre-AEDPA law "a district court abuses its discretion by ordering [an evidentiary] hearing without first requiring the petitioner to make the requisite showing [of cause and prejudice]"). But see Seidle v. Merkle, 146 F.3d 750, 754-45 (9th Cir. 1998) (holding that Keeney did not limit the discretion of a district court to hold an evidentiary hearing that is not required by Townsend); Clemmons v. Delo, 124 F.3d 944, 951 (8th Cir. 1997) ("Keeney . . . addresses only the circumstances under which an evidentiary hearing is required."); Pagan v. Keane, 984 F.2d 61, 64 (2d Cir. 1993) (holding that, after Keeney, district courts retain the power to hold evidentiary hearings even though one is not required). Thus, it was settled in this circuit that, after Keeney and before AEDPA, district courts lacked discretion to grant evidentiary hearings to develop facts that a habeas petitioner had failed to develop in state court, unless the petitioner established cause and prejudice or a miscarriage of justice.

The test AEDPA established in 1996 is even more deferential to state courts than the earlier standard:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court <u>shall not hold an evidentiary hearing on the claim unless</u> the applicant shows that--
>
> (A) the claim relies on--
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added). Note that, like the <u>Keeney</u> test, the current § 2254(e)(2) is specific to those situations in which an evidentiary hearing is requested to develop facts that the petitioner failed to develop in state court. Note further that AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which they are required.

B.      Application of the Legal Standard to Kelley's Case

Kelley requested an evidentiary hearing in his petition for habeas corpus relief and renewed his request several times thereafter. For example, after AEDPA's enactment in 1996, the court asked the parties to file memoranda briefing AEDPA's effects on the ongoing proceeding. Kelley's memorandum

argued that AEDPA's amendments to § 2254, and § 2254(e) in particular, do not apply to this case, and it urged the court to honor Kelley's previous demand for a hearing. The State took the opposite position and specifically noted that the amended § 2254(e) limits the availability federal evidentiary hearings.

On April 23, 1997, Kelley, acting under the impression that the court had ordered an evidentiary hearing "for some time during the period of May 12 to May 23, 1997," moved the court for leave to issue subpoenas requiring several witnesses to appear at the federal government's expense to testify in support of his claims.[21]

---

[21] Kelley styled his motion as a Motion for Issuance of Witness Subpoenas and Award of Witness Fees and Expenses Without Cost to Petitioner. As authority for his motion, he cited Fed. R. Crim. P. 45(c)(3)(B), "Computing and Extending Time," and 21 U.S.C. § 848(q), "Appeal in capital cases; counsel for financially unable defendants." Section 848 was plainly inapplicable. The section applies to cases in which the death penalty is imposed under § 848; Kelley's was imposed under Florida law. Because the rule of criminal procedure he cited was also inapplicable, we assume that Kelley meant to cite Rule 45(c)(3)(B) of the Federal Rules of Civil Procedure, "Protection of Persons Subject to Subpoenas." That section states:

> If a subpoena . . . requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial . . . the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony . . . that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance . . . only upon specified conditions.

Fed. R. Civ. P. 45(c)(3)(B)(iii).

The State objected to Kelley's motion because the motion neither demonstrated "a substantial need for the testimony" of the witnesses sought to be subpoenaed nor represented that the witnesses would "be reasonably compensated." As noted in the text, the State also objected on the ground that an evidentiary hearing was not permitted.

35

The State filed a response on April 30, contending that a hearing should not be held.[22] The State protested that Kelley had not shown "(1) cause for, and prejudice from, the failure to develop such facts, or (2) that a federal evidentiary hearing is necessary to prevent a fundamental miscarriage of justice."

On May 27, 1997, Kelley filed a pretrial memorandum outlining several avenues along which he hoped to develop additional facts to support his claims. Ultimately, the memorandum asked the court to convene a hearing to receive Kelley's new evidence. In the alternative, Kelley asked for a hearing to argue that the court could receive that evidence because he had cause for his failure to present it to the state courts and resulting prejudice.

On August 26, 1997, the court heard argument of counsel on the question of whether to hold an evidentiary hearing. At a status conference held on December 15, 1998, the court indicated its inclination to hold an evidentiary hearing in both Ft. Pierce and Boston, where it could receive the testimony of witnesses located in that vicinity and alleviate concerns about the cost of transporting many of Kelley's witnesses. The State protested again:

---

[22] Kelley amended his Motion for Issuance of Witness Subpoenas and Award of Witness Fees and Expenses Without Cost to Petitioner on September 14, 1998, and the State responded with the same challenges.

MS. DITTMAR:[23] [Y]our Honor, I feel like I need to reiterate the respondent's position that there just is no reason—

THE COURT: I know what your position is; that you don't think it necessary.

MS. DITTMAR: That is correct, your Honor.

THE COURT: I feel under all of the circumstances that the better course is to have the hearing.

MS. DITTMAR: Your Honor, I am not sure what circumstances those are. I am not aware of any capital case in Florida where there has been a federal evidentiary hearing after there has been a full and fair hearing in State Court. And I just don't understand the legal basis for having any of these witnesses give testimony at this point.

THE COURT: Well, that is not the kind of new ground I would like to break. And I promise you I will review it one more time before I take any, set the wheels in motion with the Administrative Office.[24]

The court deferred its final ruling on the evidentiary hearing issue until November 22, 2000, when in a telephone conference with counsel, it resolved to hold a hearing on Kelley's remaining habeas claims. The State emphasized that it had "a continuing objection to holding the hearing at all." Over that objection, the court decided that the hearing would begin the next spring in Boston.

The State persisted in its opposition to the hearing. On December 11, 2000, for instance, the State once again objected to having a hearing; altenatively, it moved the court to limit the scope of the hearing, contending that it should be

---

[23] Carol M. Dittmar appeared on behalf of the State. This transcript excerpt has been edited to correct the spelling of her surname.

[24] The court apparently felt it necessary to obtain the approval of the Administrative Office of the United States Courts to hold an evidentiary hearing in Boston at government expense.

limited only to Kelley's claims of ineffective assistance of counsel during the penalty phase of Kelley's trial.

On December 29, 2000, the court entered an order scheduling the evidentiary hearing to commence in Boston on April 24, 2001.

On March 21, 2001, the state filed written objections to Kelley's list of proposed witnesses. Once again, it reiterated its opposition to the course the court was taking:

> Petitioner has failed to demonstrate any cause or prejudice for his failure to present these witnesses at his state court postconviction evidentiary hearing. Absent such cause and prejudice, this additional evidence should not be presented. . . . Since the Petitioner has not offered any justification for his failure to present this evidence when he was granted the opportunity to do so in state court, he is precluded from offering it at his federal evidentiary hearing.

The court did not address the State's December 11, 2000 motion to limit the scope of the evidentiary hearing until March 18, 2002. Because the hearing had already been held at that point and, indeed, had concluded almost a year earlier, the court denied the State's motion as moot.

In our view, the district court abused its discretion in granting the evidentiary hearing. First, the court failed to determine the appropriate legal standard for measuring its discretion to grant the hearing. Second, despite the State's continuous objections to the hearing, the court failed to acknowledge and

38

apply any legal constraint on its discretion at all.  We elaborate on these points below.

1.     The District Court's Failure to Ascertain the Appropriate Legal Standard

Determining the test to be applied in this case—AEDPA's or the pre-AEDPA standard—is a difficult question that cannot be resolved on this record. The district court and the litigants uncritically agreed that the pre-AEDPA cause-and-prejudice test applied.  Although it is true that Kelley filed his habeas petition prior to AEDPA's enactment, the possibility of retroactive application complicates our analysis.

The Supreme Court addressed the extent of AEDPA's retroactive application in Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997).  The Court noted that AEDPA amended portions of Title 28, Chapter 153 of the United States Code, which involves habeas corpus proceedings generally. Section 2254(e)(2), which contains the updated limitations on federal evidentiary hearings, was among the amended provisions in that chapter.[25]  AEDPA also

---

[25]  As the Court explained, AEDPA eliminated what was formerly § 2254(d) and moved what was once subsection (e) to subsection (f).  Lindh, 521 U.S. at 332, 117 S. Ct. 2066.

> [I]n place of the old (d), it inserted a new (d) followed by a new (e), the two of them dealing with, among other things, the adequacy of state factual determinations as bearing on a right to federal relief, and the presumption of correctness to be given such state determination.

"creates an entirely new chapter 154, with special rules favorable to the state party, but applicable only if the State meets certain conditions, including provision for appointment of postconviction counsel in state proceedings." Id. at 327, 117 S. Ct. at 2063. AEDPA specifically provided that chapter 154, which pertains only to capital cases, "shall apply to cases pending on or after the date of enactment of this Act." AEDPA § 107(c), 110 Stat. at 1221 (codified as note to 28 U.S.C. § 2261). Because the statute contained no similar indication about the reach of the amendments to chapter 153, the Supreme Court concluded that AEDPA's text fairly implies "that the new provisions of chapter 153 generally apply only to cases filed after the Act became effective." Lindh, 521 U.S. at 336, 117 S. Ct. at 2068.

Although AEDPA's pertinent provision, § 2254(e)(2), is contained in nonretroactive chapter 153, its restrictions might still apply to Kelley through chapter 154, which is retroactive and at least potentially applicable. Importantly, chapter 154 incorporates parts of chapter 153 by reference; it expressly provides, for instance, that district courts must rule on the claims before them "subject to subsections (a), (d), and (e) of section 2254[.]" 28 U.S.C. § 2264(b) (emphasis added). The Supreme Court noted that where retroactive chapter 154 applies and incorporates parts of chapter 153 by reference, it renders those portions of AEDPA

---

Id.

40

retroactive for its limited purposes. As the Court explained, "[W]hen a pending case is also an expedited capital case subject to chapter 154, the new provisions of §§ 2254(d) and (e) will apply to that case[,]" even though those sections are nonretroactive without the help of chapter 154. Lindh, 521 U.S. at 335, 117 S. Ct. at 2067; see also id. at 326, 117 S. Ct. at 2063 ("The statute reveals Congress's intent to apply the amendments to chapter 153 only to such cases as were filed after the statute's enactment (except where chapter 154 otherwise makes select provisions of chapter 153 applicable to pending cases) (emphasis added)).

Kelley's habeas petition was pending when AEDPA became effective; thus, AEDPA's restrictions on federal evidentiary hearings probably extend to his case if chapter 154 applies and makes them retroactive. This conclusion, of course, begs another challenging question: Is chapter 154 applicable? At the broadest level, the chapter, entitled "Special Habeas Corpus Procedures in Capital Cases," applies only to "cases arising under section 2254, brought by prisoners in State custody who are subject to a capital sentence." 28 U.S.C. § 2261(a). Without question, Kelley, unlike the petitioner in the Lindh case, is subject to a capital sentence. More particularly, chapter 154 only applies if the state that sentenced the petitioner meets the criteria of §§ 2261(b) and (c), which involve the appointment and compensation of competent postconviction counsel for the

41

petitioner. At this time, it is not clear whether the state of Florida had satisfied those criteria.[26]

Here, the district court naively assumed that pre-AEDPA law applied. The court reasoned, "[E]xcept for select provisions that Congress explicitly made retroactive, [AEDPA's] amendments apply only to cases filed after the effective date of the amended statute." Kelley, No. 92-14246 at 9 (S.D. Fla. Sept. 19, 2002). It concluded, "As Kelley's petition was filed in 1992, and does concern the select retroactive provisions, this court must apply the law as it was prior to the 1996 amendments." Id. The court did not explain why the retroactive provisions of chapter 154 did not concern Kelley's petition. Indeed, it is apparent that the court never considered the possibility that chapter 154 made AEDPA's other provisions retroactive such that they might control the standard for granting an evidentiary hearing in this case.

---

[26] We addressed this issue once in Hill v. Butterworth, 133 F.3d 783 (11th Cir. 1997), vacated by 147 F.3d 1333, 1334 (11th Cir. 1998). The district court in that case determined that Florida did not satisfy all of the requirements necessary to invoke chapter 154. Id. at 784-85 (quoting Hill v. Butterworth, 170 F.R.D. 509, 524 (N.D. Fla. 1997)). Noting that, since the case left the district court, Florida's laws changed in ways that might have affected the applicability of chapter 154, we remanded the case for further proceedings. Id. at 786. Soon thereafter, though, the Supreme Court decided Calderon v. Ashmus, 523 U.S. 740, 118 S. Ct. 1694, 140 L. Ed. 970 (1998), which demonstrated that the Butterworth case was nonjusticiable and rendered chapter 154's applicability moot. Consequently, on the State's petition for rehearing, we vacated our previous decision and remanded the case to the district court with instructions to dismiss the case. 147 F.3d 1333, 1334 (11th Cir. 1998). To the best of our knowledge, the issue of chapter 154's applicability to Florida cases remains unresolved.

This issue was not briefed to us, however, and the record lends no insight sufficient to permit us to decide whether chapter 154 extends to Florida such that AEDPA's restrictions on evidentiary hearings should have applied in this case.

2.     The District Court's Failure to Apply Any Legal Standard

In any event, the district court clearly abused its discretion by authorizing the hearing. The court compounded its failure to determine the applicable legal standard by neglecting to apply any standard at all.

If AEDPA applied, the court could not have afforded Kelley an evidentiary hearing. The record was, and is, devoid of any indication that Kelley's claims rely either on "new rule of constitutional law, made retroactive to cases on collateral review" or on "a factual predicate that could not have been previously discovered through the exercise of due diligence . . . ." 28 U.S.C. § 2254(e)(2)(A). Although it is the nature of Brady claims that the prosecution precludes the defense from obtaining important evidence before trial, we observe no indication that Rule 3.850 counsel were precluded from developing the factual basis for any of Kelley's collateral claims through the exercise of due diligence during the Rule 3.850 proceedings.[27] Nor do we perceive the remotest possibility that the facts

---

[27]  By the time of the Rule 3.850 proceedings, Kelley had obtained all of the items upon which the Brady claims in his federal habeas petition are based.

43

supporting the three claims for which the evidentiary hearing was granted "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found [Kelley] guilty of [murder]." 28 U.S.C. § 2254(e)(2)(B).

Even if the district court were correct in its hasty assumption that pre-AEDPA law governed its decision, the court abused its discretion by neglecting to apply the pre-AEDPA test properly.

Kelley, who also assumed that pre-AEDPA law applied, advanced, as he does here, several explanations for why he was entitled to an evidentiary hearing under Townsend. None have merit. He argues that the Rule 3.850 court's factual determinations cannot be presumed correct because the court failed to address "crucial allegations and matter in dispute" and because it made "findings that were clearly unsupported by the record." We cannot agree. In the Rule 3.850 court, Kelley's attorneys placed twenty-six exhibits in evidence and presented the testimony of ten witnesses in support of the Kelley's claims for relief. The court systematically analyzed each of Kelley's claims in a thorough opinion that was ultimately given great deference by the Florida Supreme Court. After reviewing the record of the Rule 3.850 proceedings, we conclude that the court's findings are fairly supported.

Thus, Kelley's only basis for obtaining a federal evidentiary hearing must be that he failed to develop material facts adequately in the Rule 3.850 court. As explained above, the district court had discretion to allow a hearing before AEDPA took effect only if Kelley could satisfy Keeney's test of cause and prejudice or miscarriage of justice. The court erroneously neglected to apply this standard. Indeed, although the court voiced its view that the hearing was necessary, the record is barren of any indication as to why it concluded that a hearing was permissible.

Because it failed properly to apply Keeney and our subsequent precedent, the district court has deprived us of a record basis for deciding whether Kelley established cause and resulting prejudice for his failure to develop the factual bases for his claims in the Rule 3.850 court. In oral argument in this appeal, Kelley's attorney agreed that the district court failed to make findings of cause and prejudice. In fact, he contended that this court could not make a cause-and-prejudice determination on the record as its stands, and that if we conclude that the district court erred in granting Kelley an evidentiary hearing, we should remand the case to the district court to permit Kelley to show the cause and prejudice that warranted the district court's decision to hold an evidentiary hearing.

Even so, we observe from what is before us that Kelley would have faced

45

great difficulties in satisfying Keeney's test. To show cause, Kelley had to prove that some impediment external to the decisions of his Rule 3.850 counsel prevented him from first presenting to the state court the evidence he introduced in the hearing in the district court. See Murray v. Carrier, 477 U.S. 478, 492, 106 S. Ct. 2639, 2648, 91 L. Ed. 2d 397 (1986). Three of the eleven witnesses Kelley called to the stand before the district court testified to events that occurred in Kelley's presence. If Kelley now hangs his "cause" hat on Brower's insufficient pretrial investigation, we are baffled as to why Kelley required an investigator at all to discover these witnesses. Furthermore, the record reveals no hint that Kelley was incapable of fully developing his collateral claims in the Rule 3.850 court. Kelley's failure to present evidence to that court must not be confused with his inability to develop certain evidence at the second trial. For example, although prosecutorial misconduct might have created cause for defense counsel's failure to present certain evidence at trial, the record before us yields no indication that similar misconduct impeded counsel from presenting to the Rule 3.850 court the evidence they introduced (for the first time) at the federal hearing. By the same token, although trial records rarely reflect a complete account of an attorney's ineffectiveness, there is no apparent reason why Kelley should not have known the extent of trial counsel's shortcomings by the time he filed his Rule 3.850 motion

46

for collateral relief.

Kelley would also be hard-pressed to demonstrate any prejudice for failing to develop the new evidence that was not properly presented to the state court. If Kelley was prejudiced by such failure, it must be because he either (1) would have prevailed on a claim he asserted had he introduced the new evidence with it, or (2) would have prevailed on a claim he never asserted at all.

Kelley cannot establish the latter circumstance. To raise an unexhausted claim for the first time in a federal habeas corpus proceeding, the petitioner must first establish cause and prejudice or miscarriage of justice for failing to exhaust the claim in state court. See, e.g., Bailey v. Nagle, 172 F.3d 1299, 1302 (11th Cir. 1999) (citations omitted). This is a one-time requirement. If the petitioner meets it successfully, he can go forward and develop the claim's factual basis; if he does not, the claim is barred and the issue of factual development is moot. As we explain below, the district court improperly granted Kelley relief on an unexhausted instance of his ineffective assistance of counsel claim. See supra Part IV.A. Because that instance of Kelley's claim was not presented to the state courts, its was procedurally defaulted. Kelley obviously could not have been prejudiced in the district court by his failure to develop evidence in the Rule 3.850 court for a claim he can no longer raise.

Kelley would also have difficulty establishing prejudice from Rule 3.850 counsel's failure to present the new evidence supporting the claims he did exhaust. The district court correctly denied claims (4), (5), and (6) as a legal matter. Kelley, No. 92-14246 at 29 (S.D. Fla. Aug. 31, 2000). Additional evidence could not have enhanced these claims. The court rejected claim (3) on the ground that the State did not deny Kelley due process by destroying certain evidence after Sweet's second trial because the State had not done so in bad faith. Kelley, No. 92-14246 at 10-11 (S.D. Fla. Dec. 30, 2002). Kelley's new evidence had nothing whatsoever to do with the State's intentions surrounding the destruction of the evidence. Thus, that evidence could not have enhanced that claim. Furthermore, for reasons we discuss below, see infra Part IV.B, Kelley's Brady claims fail for lack of legal materiality. No amount of additional evidence can revive a claim that is legally insufficient.

That leaves us with Kelley's ineffective assistance claims. The evidence Kelley presented to the district court shed little light on the instances of his ineffective assistance claim that had been exhausted and, therefore, were preserved for federal review. Most of the new evidence appears relevant primarily to the procedurally barred claim that Kelley's conviction might not have resulted had defense counsel not relied on Brower to conduct the pretrial investigation. Even if

48

the claim were not barred, we have serious doubt that new evidence of Brower's incompetence justified the granting of habeas relief.[28]  After all, Kelley's counsel had well over a month after Brower's disappearance to conduct further research for Kelley's second trial if such research were necessary.  Furthermore, Kelley's counsel testified that their decision to rest without putting on a defense was a matter of calculated trial strategy.  See infra note 34.

All of this said, we need not remand the case, as we did in Mathis, 975 F.2d at 1497, to enable the petitioner to show cause and resulting prejudice for his failure to present his new evidence to the Rule 3.850 court.  As we explain in Part IV, Kelley would not qualify for habeas relief as a matter of law even if the additional evidence were admitted and properly weighed.

## IV.
### Rulings on Habeas Claims

Having decided that the district court abused its discretion by granting the evidentiary hearing without applying the proper legal standard, we turn to the relief it granted.  The court granted habeas relief on claim (1) for five Brady violations, and claim (2) for ineffective assistance of trial counsel.  We address

---

[28]  Indeed, that Kelley told the district court that he needed an evidentiary hearing to develop this instance of his ineffective assistance claim underscores the fact that he did not raise the claim in his Rule 3.850 proceeding.

these rulings in reverse order.  As indicated <u>supra</u>, neither claim has merit with or without the evidence Kelley presented to the district court.

A.    Ineffective Assistance of Counsel

The district court granted Kelley habeas relief for ineffective assistance on the ground that "Kelley's trial counsel was deficient in having a disbarred attorney, lazy to a fault, resolve whether or not to conduct a pretrial investigation." <u>Kelley</u>, No. 92-14246 at 9 (S.D. Fla. Dec. 30, 2002).  Kelley defaulted this claim by failing to present it to the Rule 3.850 court.  Therefore, the district court should have dismissed it.  Even if the claim were preserved, however, it should have failed.

    1.    The Exhaustion Requirement

Habeas petitioners generally cannot raise claims in federal court that were not first exhausted in state court.  <u>See, e.g.</u>, <u>Snowden v. Singletary</u>, 135 F.3d 732, 735 (11th Cir. 1998).  To properly exhaust a claim, "the petitioner must afford the State a full and fair opportunity to address and resolve the claim on the merits." <u>Keeney</u>, 504 U.S. at 10, 112 S. Ct. at 1720.  It is not sufficient merely that the federal habeas petitioner has been through the state courts, <u>Picard v. Connor</u>, 404 U.S. 270, 275-76, 92 S. Ct. 509, 512, 30 L. Ed. 2d 438 (1971), nor is it sufficient that all the facts necessary to support the claim were before the state courts or that

50

a somewhat similar state-law claim was made, <u>Anderson v. Harless</u>, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).  The petitioner must present his claims to the state courts such that they are permitted the "opportunity to apply controlling legal principles to the facts bearing upon (his) constitutional claim."  <u>Picard</u>, 404 U.S. at 277, 112 S. Ct. at 513 (alteration in original).

Thus, the prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief.  For example, habeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts.  <u>Footman v. Singletary</u>, 978 F.2d 1207, 1211 (11th Cir. 1992).  As we explained,

> allowing a habeas petitioner to allege a single instance of ineffective assistance in his state post-conviction proceedings and then proceed to federal court to allege additional instances would be contrary to the state's "full and fair opportunity to address the claim on the merits." The state would never have the benefit of evaluating the claim using a fully developed set of facts.  This would not be the "serious and meaningful" exhaustion of claims that Congress intended.

<u>Id.</u>; <u>see also</u> <u>Carriger v. Lewis</u>, 971 F.2d 329, 333 (9th Cir. 1992) (en banc) (holding that, where the habeas petitioner properly raised only one ineffective assistance claim on collateral attack in state court, he could seek federal relief based on that specific claim, but not based on other alleged attorney defects that

were not presented to the state courts); Maynard v. Lockhart, 981 F.2d 981, 984-85 & n.1 (8th Cir. 1992) ("To preserve an allegation of ineffective assistance for federal habeas review, a petitioner must present that specific allegation to a state court."). Furthermore, habeas petitioners cannot preserve otherwise unexhausted, specific claims of ineffective assistance merely by arguing that their lawyers were ineffective in a general and unspecified way. See Weeks, 26 F.3d at 1044-46 (rejecting petitioner's argument that "the general claim of ineffective assistance in state court preserves for federal review all alleged instances of ineffectiveness, regardless of whether evidence of a particular act was presented to the state court"). In sum, to preserve a claim of ineffective assistance of counsel for federal review, the habeas petitioner must assert this theory of relief and transparently present the state courts with the specific acts or omissions of his lawyers that resulted in prejudice.

Federal habeas petitioners are undoubtedly on their strongest footing with regard to the exhaustion requirement when their federal claims are carbon copies of the claims they presented to the state courts. Such reproduction leaves no question that the claims presented to the federal court are the same as those that were presented to the state court. But we do not demand exact replicas. We recognize that habeas petitioners are permitted to clarify the arguments presented

to the state courts on federal collateral review provided that those arguments remain unchanged in substance.

We are not so draconian or formalistic as to require petitioners to give a separate federal law heading to each of the claims they raise in state court to ensure exhaustion for federal review. We simply require that petitioners present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation. See Picard, 404 U.S. at 277, 112 S. Ct. at 513. As the First Circuit observed,

> [T]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record. The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick.

Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988).

To ensure exhaustion, petitioners must present their claims in this manner of clarity throughout "one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732, 144 L. Ed. 2d 1 (1999). As long as state supreme court review of a prisoner's claims is part of a state's ordinary appellate review procedure, prisoners of that state must present their claims to the state supreme court to preserve those claims for federal

review, even if review by that court is discretionary. See id. at 848-49, 119 S. Ct. at 1734.

The habeas petitioner can escape the exhaustion requirement only by showing cause for the default and actual prejudice resulting therefrom, or by establishing a fundamental miscarriage of justice. Bailey, 172 F.3d at 1306 (citing Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986); Schulp v. Delo, 513 U.S. 298, 324-27, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)). Absent the applicability of these exceptions, nonexhausted claims cannot be raised in federal habeas corpus petitions.

We review a district court's determination as to whether a habeas petitioner is procedurally barred from raising a claim in federal court de novo. Lusk v. Singletary, 112 F.3d 1103, 1105 (11th Cir. 1997).

2.      Application of the Exhaustion Requirement to Kelley's Case

Kelley's Rule 3.850 motion cited seven specific instances of ineffective assistance of counsel. First, the motion contended that Kelley's trial counsel, Kunstler and Edmund, were ineffective because "they failed to thoroughly review" certain materials obtained by Rule 3.850 counsel that could have been used "to determine the full extent of the evidence destroyed in 1976," after John Sweet's second trial.

Second, the motion argued that Kunstler and Edmund were ineffective because they failed to object to the expert testimony of three of the State's expert witnesses and stipulated to the testimony of a fourth expert. These witnesses testified about the destroyed evidence, and Kelley's Rule 3.850 counsel reasoned that they could not be cross-examined effectively because that evidence was not in existence at the time of Kelley's trial.

Kelley's third theory of ineffective assistance contained a hodgepodge of grievances, all of which fell under the banner of "Failure to Develop Defense Theories." The gravamen of this claim was that Kunstler and Edmund made a series of missteps that undermined the defense's two key theories: first, that the person who registered at the Daytona Inn Motel around the time of the murder, although using Kelley's name, was not actually defendant William Kelley; and second, that John Sweet executed the murder himself without the assistance of hired assassins. Kelley's Rule 3.850 counsel argued that his trial counsel should have more adroitly resisted the State's effort to link Kelley to the motel. Along these lines, the Rule 3.850 motion specifically faulted Kelley's trial counsel for failing "to adduce evidence that the handwriting on the motel's registration record was not the defendant William Kelley's handwriting, a fact that the defendant had made known to defense counsel." It faults trial counsel for stipulating that the car

registered at the motel belonged to Jennie Adams, who had been seen with Kelley from time to time and was his girlfriend. Additionally, the motion contended that trial counsel should have attempted to show that descriptions of the women who accompanied the man registered under Kelley's name at the motel did not match the appearance of Jennie Adams.

In this same section, the motion asserts that Edmund performed deficiently in his cross-examination of Kaye Carter, the daughter of a clerk at the motel. In the first place, Edmund failed to differentiate between Kelley and the supposed imposter who used Kelley's name at the motel. This blunder, Rule 3.850 counsel insisted, reinforced the State's devastating contention that the men were one in the same. Secondly, Edmund did not use cross-examination to suggest that the man registered under Kelley's name could have actually been Steve "the Greek" Busias, a person from Kelley's neighborhood who allegedly matched physical characteristics of the man at the motel, as described by Carter. The motion stressed that Edmund even stated at one point that Kelley, rather than the theoretical imposter Kelley, registered the car matching Jennie Adams's license plate at the Daytona Inn.

The Rule 3.850 motion also posited other specific deficiencies related to Kelley's third ineffective assistance claim: the broad "Failure to Develop Defense

Theories." It contended, for instance, that defense counsel should have more carefully researched the weather and daylight conditions at the time of the murder. Carter testified that the man registered as Kelley arrived at the motel before 8:30 P.M. on the night of the murder. One of the victim's neighbors, however, testified that she saw two people leaving the victim's home, driving the victim's car with the lights on. Kelley's Rule 3.850 counsel theorized that the late time of sunset on the day of the murder would have made it improbable that the killers drove from the victim's house in Sebring after twilight and reached the motel in Daytona before 8:30 P.M. Yet another line of argument involves comments Kelley made to FBI Agent Ross Davis at the time of arrest, which tended indicate Kelley's knowledge of the murder. On this subject, the motion faulted Kelley's trial counsel for failing to present copies of a 1981 news story about the murder during Davis's cross-examination.

Most significantly, this same third ineffective assistance claim asserted that "defense [counsel] failed to develop facts and interview witnesses to support its 'wrong William Kelley' defense." Purportedly, many witnesses would have been available to testify that Kelley's appearance at the time of the murder differed from that of the man Sweet described as a triggerman.

The remaining claims of ineffective assistance of counsel are less important

57

for purposes of this appeal.  The fourth instance cited by the motion involved comments Edmund made during the jury-selection voir dire alluding to Kelley's prior criminal conduct.  The fifth instance faulted defense counsel for failing to object to the <u>Allen</u> charge given to the jury.  The sixth instance complained that Kelley's defense was ineffective in impeaching John Sweet's credibility and found specific fault with counsel's failure to object when the court declined to answer a question the jury submitted during deliberations about whether Sweet received immunity in Florida for his testimony against Kelley.  Finally, the Rule 3.850 motion cited as a seventh instance of ineffective assistance Kunstler and Edmund's failure to request a change of venue.

Kelley's brief to the Florida Supreme Court appealing the denial of Rule 3.950 relief cast Kelley's ineffective assistance of counsel claims in substantially similar terms.[29]

By the time he sought federal habeas relief, however, many of Kelley's ineffective assistance claims had assumed a strikingly different hue.  At the

---

[29]  Kelley's brief to the court brief differs from his Rule 3.850 motion only insofar as it adds the claim that the Rule 3.850 court erred in failing to admit into evidence an affidavit drafted for, but never signed by, Edmund.  Kelley argues that this affidavit was relevant because it accurately reflected Edmund's view of his effectiveness as trial counsel even though Edmund eventually drafted a different affidavit, rather than signing the one at issue.  This argument clearly amounts to an appeal of an evidentiary ruling; therefore, it works no material change or supplement to Kelley's ineffective assistance claims.

broadest level, Kelley's federal petition asserted ineffective assistance of counsel for "failure to investigate, to depose witnesses, to present a case in defense, and to perform other basic defense functions." The district court ably distilled Kelley's claims down to the following distinct instances of ineffective assistance of counsel:

> (1) the unreasonable failure to investigate and to present evidence on behalf of Kelley; (2) the failure to take pretrial depositions and to seek a more fair trial venue; (3) the failure to impeach, confront, and rebut the state's case; (4) the failure to make an effective closing argument and to object to improper closing argument by the state; and (5) the failure to provide reasonably effective assistance with regard to the submission of proposed jury instructions.

Kelley, No. 92-14246 at 4 (S.D. Fla. Dec. 30, 2002)

As noted above, the district court granted Kelley relief for the first of these instances ineffective assistance of counsel: defense counsel's failure to investigate. This decision rested almost exclusively on defense counsel's reliance on disbarred Harvey Brower for handling the pretrial investigation. On the basis of the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the district court reasoned that Kelley's counsel were ineffective unless they either conducted a reasonable investigation or made a reasonable decision not to investigate. Id. at 691, 104 S. Ct. at 2066 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable

59

decision that makes particular investigations unnecessary.")  Applying this test,

the court found that

> neither Kunstler nor Edmund made the decision not to investigate. They mistakenly assumed that Brower, the disbarred attorney/investigation, would conduct his investigation in a conscientious manner.  Ultimately, however, Brower failed to perform an investigation, and his failure to present the findings of a pretrial investigation or to file any pretrial motions[30] effectively provided Kelley with ineffective counsel.  Therefore, Kelley's trial counsel was deficient in have a disbarred attorney, lazy to a fault, resolve whether or not to conduct a pretrial investigation.

Kelley, No. 92-14246 at 8-9 (S.D. Fla. Dec. 30, 2002).  Although it identified

them, the district court remarked no further on the remaining instances of

ineffective assistance Kelley raised in his petition.[31]

---

[30]  We pause to note the oddity of the district court's criticism regarding Brower's failure to file pretrial motions.  Brower was not licensed to practice law in Florida.  In fact, at the time of Kelley's trial, Brower was disbarred in Massachusetts.  It is abundantly clear, then, that Brower could not file pretrial motions.  Insofar as the district court's statement implies that Kelley's counsel (because of Brower or for other reasons) neglected to file pretrial motions in Kelley's case, the statement is plainly wrong.  Kelley's counsel argued no fewer than thirteen motions prior to Kelley's first trial.  They argued a motion to dismiss the indictment on the eve of Kelley's second trial.

[31]  As explained above, the district court identified each of the five instances of Kelley's ineffective assistance claim but grounded its ruling only on the instance concerning counsel's failure to investigate.  When it issued this order, the district court was responding to the State's motion under Fed. R. Civ. P. 59.  That motion asked the court to amend its September 19, 2002 judgment granting relief based on Kelley's Brady claims and to address the remaining claims asserted in Kelley's petition.  Although the district court refused to alter its decision regarding the Brady claims, it agreed with the State's contention that it "must settle all claims in a petition for writ of habeas corpus" to avoid piecemeal litigation and improve the quality of the judicial product.  Kelley, No. 92-14246 at 10 (S.D. Fla. Dec. 30, 2002) (citing Clisby v. Jones, 960 F.2d 925, 936 (11th Cir. 1992).  The court then proceeded to treat Kelley's petition comprehensively.  Because it noted all five instances of Kelley's ineffective assistance claim, id. at 4, but only

60

We conclude that the district court should have dismissed Kelley's ineffective assistance claim based on counsels' failure to investigate. After careful analysis of the record, we are confident that Kelley has presented no claim to the Rule 3.850 court that fairly notified the State that he intended to challenge his conviction on the ground that his attorneys were constitutionally deficient in their duty to investigate or because they relied on Harvey Brower for this chore. This ineffective assistance claim was not merely a clarified rendition of an exhausted claim, but a new claim altogether.

Kelley's broad Rule 3.850 claim concerning the "Failure to Develop Defense Theories" is the most similar, by far, to the ineffective assistance claim upon which the district court granted relief. Yet the two claims are clearly distinct, in form and in substance. The former, exhausted claim assailed Kelley's trial counsel for failing to develop and even undermining its core theories that Sweet performed the murder unassisted or that the defendant was not the person who registered at the Daytona Inn Motel under Kelley's name. In its brief to the Florida Supreme Court, Kelley's counsel summarized the claim (as also set out in

identified one as meriting relief, namely counsel's failure to investigate, we infer that the district court determined that the remaining instances of ineffective assistance are unavailing. Because Kelley did not cross-appeal the district court's order denying those features of the claim, these decisions are not before us.

61

the supplemental brief Kelley filed in appealing his conviction to the Florida

Supreme Court) as follows:

> Mr. Kelley's trial attorneys' lack of effectiveness was so plain that appellate counsel sought to present the claim on direct appeal. They failed to investigate, develop, or present readily available evidence that would have supported their own defense theories while presenting the jury with incomprehensible comments which gutted their own theory and which can be supported by no <u>reasonable</u> tactic.

This claim most closely approached the distinct, unexhausted claim that prevailed

in the district court when Kelley argued to the Florida Supreme Court,

> [B]y virtue of defense counsel's incompetence, the jury was presented with only one version [of the facts]: the defendant William Kelley had been registered at the Daytona Inn on the days surrounding the murder of Maxcy, just as John Sweet had testified. This version, however, was far from accurate, and counsel had the tools with which they could have shown the jury the inaccuracy. Without a reason, they simply failed to investigate and thus failed to develop or use the tools that they had.

The Rule 3.850 court and, eventually the Florida Supreme Court, carefully

distilled Kelley's broad "failure to develop defense theories" claim into seven

specific grievances:

> 1. Counsel failed to adduce evidence that the handwriting on the motel registration record was not the defendant's. . . .
>
> 2. Counsel stipulated to the State's evidence linking the Mr. and Mrs. William Kelley registered at the Daytona Inn Motel to the motor vehicle owned by Jennie Adams. . . .

3.  Counsel failed to point out the distinctions between the man at the Daytona Inn Motel, as described by Kaye Carter, and the defendant. . . .

4.  Counsel failed to investigate and utilize the inconsistencies in the time periods on the evening of the murder. . . .

5.  Counsel failed to interview and call witnesses to testify regarding the defendant's physical characteristics in 1966. . . .

6.  Counsel failed to obtain and present evidence (newspaper articles) which would explain the defendant's knowledge of the Maxcy killing when he was arrested. . . .

7.  Counsel failed to obtain affidavits and present testimony from three attorneys that the defendant contacted them to determine if there was a warrant for the defendant's arrest.

Kelley, 569 So. 2d at 759-60.  Clearly, the Florida courts comprehended in these arguments no intimation that Kelley's defense counsel flouted their general duty to investigate or, alternatively, decide not to investigate by relying on Brower for this aspect of the trial preparation.  The State did not divine this argument either, and, consequently, its own brief to the Florida Supreme Court articulated no rebuttal to the novel claim that prevailed in the district court.

The silence of the supreme court and the State in this regard is unsurprising.  Nowhere in the portion of Kelley's brief asserting ineffectiveness for the failure of his counsel to develop defense theories did Kelley mention Harvey Brower.  Indeed, in all 101 pages of Kelley's brief to the state supreme court, Brower's

name appears only twice, both times in a single paragraph:

> Other noteworthy and telling matters came to light at the [Rule] 3.850 hearing. Harvey Brower, a disbarred attorney, did much of the investigation and preliminary legal work prior to Mr. Kelley's first trial. Apparently, Mr. Brower supplied a list of names and addresses of potential witnesses to the defense, and the defense learned that the addresses listed were incorrect—they did not represent actual addresses.

This paragraph—unique in its mention of Brower—appears not in a discussion of trial counsel's investigatory dereliction, but rather in the course of Kelley's separate evidentiary argument that the Rule 3.850 court erred by excluding from evidence an unsigned affidavit regarding Edmund's effectiveness.[32]

In stark contrast to his brief to the Florida Supreme Court, Kelley's federal habeas petition expends almost seventeen pages arguing that his trial counsel were ineffective for their "unreasonable failure to investigate." Each of these pages is devoted almost exclusively to criticizing counsel for their reliance on Brower. Indeed, the very first sentence of the section reads,

> Virtually all pretrial matters were delegated to the incompetent hands of one Harvey Brower, a Massachusetts former lawyer and federal felon who was disbarred in 1979 for defrauding a former nun out of

---

[32] This section of Kelley's brief is entitled, "The Judge Should Have Granted Mr. Kelley's Offer to Admit Into Evidence Jack Edmund's Unsigned Affidavit." By way of background, Kelley's Rule 3.850 counsel drafted an affidavit regarding Edmund's performance at trial and asked him to sign it. Edmund refused to sign this particular document and eventually drafted and signed a different affidavit on this subject and provided it to the defense. See supra note 29.

$11,400 in phony stock shares and a loan to a non-existent third party.

Throughout this extensive argument, Kelley cites repeatedly to four appended materials: two Massachusetts judgments, one in which Brower was censured and another in which he was disbarred; and two affidavits of Massachusetts attorneys who attested to Brower's incompetence or irresponsibility. Tellingly, these exhibits were never presented to the state courts. We conclude that this earlier omission was no oversight; the appended materials appear for the first time before the district court because the federal proceeding marked the first appearance of Kelley's claim that his defense counsel denied him a constitutional right by relying on Brower to conduct their pretrial investigation.

Our concerns for comity, judicial efficiency, and fairness to the respondent preclude us from finding that the ineffective assistance claim that prevailed in the district court was properly exhausted. Recharacterizing the claim Kelley presented to the Rule 3.850 court at this late hour as a challenge to the counsel's reliance on Brower for pretrial investigation would "fundamentally alter the legal claim[s] already considered by the state courts" such that we could not consider the restated claim as exhausted. Vasquez v. Hillery, 474 U.S. 254, 260, 106 S. Ct. 617, 622, 88 L. Ed. 2d 598 (1986). And what we cannot achieve by such recharacterization,

65

neither can we achieve by sewing disjointed factual snippets scattered throughout the Rule 3.850 record into a patchwork federal claim. At the very most, Kelley's singular reference to Brower in his brief to the Florida Supreme Court brief amounts to a "needle[] in the haystack of the state court record." Martens, 836 F.2d at 717. Kelley's other Rule 3.850 claims and other instances of ineffective assistance come nowhere near shouting distance of the issue upon which the district court granted relief.

Our finding of procedural default is in no way disturbed by the fact that Brower's antics were discussed to some degree on the record during the Rule 3.850 hearing. This discussion was not sufficient to "afford the State a full and fair opportunity to address and resolve the claim on the merits." Keeney, 504 U.S. at 10, 112 S. Ct. at 1720." By the time of the hearing, the State could not have prepared for or presented evidence to rebut the argument that defense counsel were deficient in relying on Brower. Morever, even if the evidence Kelley put on at the Rule 3.850 hearing would have supported a finding of ineffective assistance on this then-unasserted instance of that claim, Kelley would not have satisfied the exhaustion requirement. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." Harless, 459 U.S. at 6, 103 S. Ct. at 277 (citations omitted). To

66

exhaust the claim sufficiently, Kelley must have presented the state court with this particular legal basis for relief in addition to the facts supporting it.

Our conclusion also withstands Kelley's unpersuasive argument that the State waived the requirement of exhaustion. Although prior to AEDPA's enactment, this court held that "the State may waive exhaustion either expressly or impliedly," we explained that such waiver occurs "[w]hen the State has not raised lack of exhaustion in the district court or on appeal. . . . " Atkins v. Attorney General of State of Ala., 932 F.2d 1430, 1431 (11th Cir. 1991) (citations omitted).[33] In this case, the State pled lack of exhaustion in the district court and in its brief to us. Accordingly, exhaustion remains very much a viable issue.

Because Kelley's petition contains both exhausted and nonexhausted claims, it is a classic "mixed petition." Ordinarily, "a district court must dismiss such 'mixed petitions,' leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court." Rose v. Lundy, 455 U.S. 509, 510, 102 S. Ct. 1198, 1199, 71 L. Ed. 2d 379 (1982). Rose informed petitioners

---

[33] Where AEDPA applies, states will not be deemed to have waived the exhaustion requirement unless they indicate their intention to waive the requirement expressly. 28 U.S.C. § 2254(b)(3). In fact, the Tenth Circuit has noted that states are now free to raise this issue for the first time on appeal. See Hale v. Gibson, 227 F.3d 1298, 1327 n.12 (10th Cir. 2000).

that they could no longer withhold collateral claims from their state court petitions in the hope that the district court would entertain them on the merits.

Dismissing a mixed petition is of little utility, however, when the claims raised for the first time at the federal level can no longer be litigated on the merits in state court because they are procedurally barred. In such a case, requiring the petitioner to return to state court only to make a futile application for relief simply delays the federal courts' adjudication of his petition. As we observed in Snowden v. Singletary, 135 F.3d at 736 (citations and footnotes omitted),

> when it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless "judicial ping-pong" and just treat those claims now barred by state law as no basis for federal habeas relief. . . . [W]here all the unexhausted claims are procedurally barred from being considered in Florida courts, it would serve no purpose to dismiss the petition for further exhaustion because review of those claims is unavailable in state courts.

Without question, the Florida courts will no longer entertain on the merits of the claims Kelley has asserted for the first time in the instant petition. See, e.g., Aldridge v. State, 503 So. 2d 1257, 1258 (Fla. 1987) (holding that a state prisoner is procedurally barred from raising on a second motion for postconviction relief "somewhat different facts to support his ineffective-assistance-of-counsel claim"). Clearly, Kelley could demonstrate no cause for not having raised the Brower-

related instance of ineffective assistance of counsel in the Rule 3.850 proceeding. There was no conceivable impediment to raising it. Consequently, we can address Kelley's remaining claims, rather than remanding the case to the district court with the instruction that it dismiss Kelley's petition.

3. Kelley's Lack of Prejudice from Ineffective Assistance

Although Kelley's procedural default obviates any need to reach the merits of his ineffective assistance claim, we pause briefly to voice our serious skepticism that counsel's reliance on Brower for pretrial investigation could have amounted to a violation of Kelley's rights.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S. Ct. at 2064. More specifically, we have held that

> [t]o succeed on a claim of ineffective assistance, Petitioner must show both incompetence and prejudice: (1) "[P]etitioner must show that 'counsel's representation fell below an objective standard of reasonableness,'" and (2) "[P]etitioner must show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"

Chandler v. United States, 218 F.3d 1305, 1312-13 (11th Cir. 2000) (quoting Darden v. Wainwright, 477 U.S. 168, 106 S. Ct. 2464, 2473, 91 L. Ed. 2d 144

69

(1986)) (alterations in original).

Unfortunately, the district court did not find—explicitly or implicitly—that Kelley suffered prejudice as a result of counsel's performance. Recognizing this deficiency in the district court's order, Kelley's attorneys moved the court for clarification on this issue on January 6, 2003:

> [I]n an abundance of caution, Petitioner respectfully suggests that further specificity regarding the <u>Strickland</u> prejudice prong might be warranted in order to minimize the risk that the Court of Appeals might misunderstand this Court's determination and either might (a) fail to recognize that this Court had indeed made the requisite finding under the 'prejudice prong' of <u>Strickland</u>, or might (b) assume that the finding had been made but harbor some uncertainty regarding the basis on which it had been made.[34]

The district court denied the motion for clarification in an order entered on January 8, 2003.

This denial is not surprising. Prejudice would be difficult, if not impossible,

---

[34]   In support of their motion for clarification, counsel proffered two recommended findings of prejudice. First, trial counsel's shoddy pretrial investigation rendered them unable to call Hobart Willis as a defense witness. Willis testified by videotape at the federal evidentiary hearing that Steven Busias claimed responsibility to him for the Maxcy murder. Apparently, Willis notified Brower that he would be available to testify in Kelley's defense. Second, counsel were unable to utilize the testimony of Joseph Whittington. Richard Mars, an attorney from Bartow, Florida testified at the federal evidentiary hearing that he interviewed Whittington before Kelley's second trial. Ostensibly, Whittington implied that John Sweet had a motive for framing Kelley.

It bears mention that this second asserted prejudice is rather inconsistent with the notion that defense counsel failed to investigate. Furthermore, Edmund did, as part of his calculated trial strategy, argue that Sweet had such a motive. In fact, Edmund testified that he was aware of Whittington and concluded that he was not a valuable witness because Edmund intended to advance a different frame-up motive than that to which Whittington would speak.

70

to find on this record.  Kelley had two trials, and Brower's services were employed only for the first.  Obviously, Kelley's conviction resulted from the second trial.  By the second trial, Kelley's defense team was well aware of what the State's case would look like, since the State had revealed its hand during the first trial, and the defense team had a transcript of the testimonies of the State's witnesses.  Furthermore, the nearly two months that passed between the aborted first trial and the commencement of the second trial—after Brower's inadequacy had been exposed—afforded defense counsel ample time to locate potential defense witnesses and conduct further investigation.  According to both of Kelley's trial lawyers, defense counsel did just that.  Edmund testified that he and Kunstler sent an attorney to New England after the first trial to corroborate evidence of Sweet's questionable character and to find favorable evidence about Kelley's character.  Kunstler's testimony is even more illuminating.  During Kelley's state Rule 3.850 hearing, Kunstler was asked,

> During the interim between the first trial and the second trial, did you and Mr. Edmund sit down and discuss:  Well, this is how the first trial went; now we knew what the evidence is, what the witnesses are, let's do this or let's do that, let's change some things for the second trial?

Kunstler answered, "We did.  I don't know if we did it in person.  We had a lot of telephone calls.  And since Brower had vanished from the face of the earth, Jack

71

[Edmund] had his own investigator from his office. And he put his own investigator to work." Finally, Kelley's attorneys repeatedly testified that they decided against putting on evidence at trial as a matter of strategy,[35] which afforded the defense both the first and last closing arguments to the jury at the end of the day. We must be highly deferential to such strategic decisions of counsel. As the Supreme Court instructed, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

---

[35] For instance, at the Rule 3.850 hearing, the State called Edmund to the stand:

Q: During the trial or during both trials actually, you and Mr. Kunstler [Kelley's other trial lawyer] did not call any defense witnesses. Mr. Kelley did not take the stand. Was that something that you and Mr. Kunstler discussed or how was it decided as to that aspect of the defense case what would be done or not done as far as presenting witnesses?
A: I don't remember a specific discussion about not calling witnesses. And I don't remember a specific discussion about not calling Bill [Kelley]. But that was one of those decisions that good trial lawyers familiar with the facts could make without any– I mean that really didn't take a decision. It was a matter that was going to be.
Q: Do consider that to be a matter of trial strategy?
A: Of course.

Confronted with a similar line of inquiry at the federal evidentiary hearing, Edmund testified,

I tried the case the way I thought the case should be tried with the witnesses that I was cross examining. . . . [T]his is not something that should override calling a witness who is a critical witness, but in Florida if the defendant alone testifies or doesn't testify and calls no witnesses the defense has both the opening [and] closing portions of the closing argument. In a case with none or few witnesses I think it is to the advantage of the defense to retain that if possible. Again that was a decision that was, I am sure, jointly made. . . . It is a tactic not to call any witnesses to further impeach Sweet than he had already impeached himself.

72

assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (quotation marks and citation omitted); see also Waters v. Thomas, 46 F.3d 1506, 1518-19 (11th Cir. 1995) (en banc) (observing that "[w]e cannot, and will not, second guess" the "strategic decisions trial counsel are called upon to make"). In sum, the mistrial gave defense counsel two important benefits: (1) a transcript of the State's case, and (2) an additional opportunity to conduct the investigation Brower neglected. Because counsel made full use of these benefits and because they would likely have declined as a matter of trial strategy to give up the right to make the first and last closing arguments so that they could call some of the witnesses who testified at the federal evidentiary hearing, we cannot agree that Brower's inadequate investigation prejudiced Kelley's defense.

B.     Prosecutorial Misconduct

    1.     The Brady Rule

The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215

(1963).  As the Supreme Court later clarified, there are three components of a true Brady violation:  (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.  Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999).  Evidence is material so as to establish prejudice only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985).[36]  Of course, Brady and its progeny apply only to evidence possessed by the prosecution team, which includes both investigative and prosecutorial personnel.  United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989).

An alleged Brady violation presents a mixed question of law and fact, which we review de novo.  Wright v. Hopper, 169 F.3d 695, 701 (11th Cir. 1999).

---

[36]  Justice Blackmun wrote for the majority in Bagley, but this quotation is drawn from a portion of his opinion that was joined only by Justice O'Connor.  Although a majority of the Court did not agree with this portion of the opinion in its entirety, Justice White wrote a concurring opinion, joined by Chief Justice Burger and Justice Rehnquist, agreeing with the materiality standard quoted above.  Bagley, 473 U.S. at 685 (White, J., concurring).  Since Bagley, the Supreme Court and this court have repeatedly recognized that this standard governs determinations of materiality for the purpose of deciding Brady claims.  See, e.g., Strickler, 527 U.S. at 280, 119 S. Ct. at 1948; Crawford v. Head, 311 F.3d 1288, 1325 (11th Cir. 2002).

2.     Application of the Brady Rule to Kelley's Case

The Rule 3.850 court, and the Florida Supreme Court on appeal, rejected Kelley's Brady claims on the merits.  The district court disagreed with the state courts' rulings and concluded that Kelley was entitled to relief on the claims he had presented to the Rule 3.850 court.  The district court, relying on the evidence presented to the Rule 3.850 court and at the federal evidentiary hearing, found that five items of withheld evidence were exculpatory.  It further found that the State had materially prejudiced Kelley's defense by withholding those items.  The five withheld items include

(1) a Massachusetts immunity order, indicating that Sweet received immunity from that state on March 13, 1981;

(2) The Florida Department of Law Enforcement Investigative Report authored by Agent Joe Mitchell, dated February 21, 1981;

(3) the transcript of Sweet's first trial;

(4) the second of two police reports authored by Special Agent Roma Trulock, reflecting observations of witness Kaye Carter; and

(5) a fingerprint report, constructed from prints at the victim's house and car, containing no positive matches to Kelley's prints.

Without identifying particular prejudices, the district court remarked in

75

general terms,

> Disclosure of the suppressed evidence to competent counsel would have made a different result much more probable. The essence of the State's case was the testimony of Sweet. Disclosure of his immunity and transcript from his first trial would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense.

Kelley, No. 92-14246 at 23 (S.D. Fla. Sept. 19, 2002).

Whether the withheld items the court seized upon in granting Kelley relief are considered individually or collectively, we conclude that Kelley suffered no Brady prejudice as a result of the withholding.

> a. The Massachusetts Immunity Order and the Joe Mitchell Report

On March 13, 1981, after being informed that Sweet had invoked his right against self-incrimination before a Massachusetts grand jury involving "offenses of larceny, breaking and entering a building, violations of the narcotic and harmful drug laws, and lending or money or thing of value in violation of the General Laws [of Massachusetts]," the Supreme Judicial Court of Suffolk County, Massachusetts entered an order granting Sweet transactional immunity. Its order stated, in relevant part:

> John J. Sweet shall not be prosecuted or subject to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is so compelled, after having claimed his privilege against self-incrimination to testify or produce evidence, nor

shall testimony so compelled be used as evidence in any criminal or civil proceeding against him in any court of the Commonwealth, except in prosecution for perjury or contempt while giving testimony or producing evidence under compulsion . . . .

On March 29, 1984, in his closing argument to the jury at the end of Kelley's trial, Assistant State Attorney Hardy Pickard stated that Sweet did not have to testify as a prosecution witness against Kelley in Florida to obtain the immunity the Massachusetts court granted him.[37] The district court found, albeit implicitly, that had the State given defense counsel copies of the immunity order and Joe Mitchell's investigative report prior to Kelley's trial, the prosecutor would not have made the statement at all or, if he made it, defense counsel—having the final closing argument to the jury—would have convinced the jury that the prosecutor's statement was a lie.[38] But for the lie, the district court concluded,

---

[37] Specifically Pickard argued,

John Sweet did not have to give the police Kelley to get immunity. John Sweet got immunity from Massachusetts on a long list of things. It has nothing to do with the Maxcy case or giving them Kelley on the Florida cases.

He already had his immunity from Massachusetts on loan sharking, whatever that long list of things were. He didn't have to give them Kelley to get immunity. That came up later after he went to Massachusetts and thirty investigators or however many he said were questioning him about all sorts of crimes in Massachusetts.

(Emphasis added).

[38] An alternative implicit finding is that the court would have instructed the jury to disregard the prosecutor's statement.

there was "a reasonable probability that . . . the result of the proceeding would

have been different." Bagley, 473 U.S. at 682, 105 S. Ct. at 3383.

The district court found separate Brady violations in the State's failure to

disclose the immunity order and the Mitchell report. The court also found a

symbiotic relationship between the two items, such that, when considered

together, the items' materiality was significantly enhanced and clearly established

a Brady violation. We consider these items separately and then together.

Nothing in the immunity order states that the Massachusetts court granted

Sweet immunity on the condition that he testify against Kelley in Florida.[39] To

find that the court imposed such a condition, we would first have to infer that the

court entered the order after obtaining Sweet's commitment to testify against

Kelley in Florida. Since the order does not reveal such commitment, the

commitment would have to to have been made in a separate writing or given

orally. We would have to infer further that had Sweet not made the commitment,

the court would not have granted him immunity. To draw that inference, we

_____

[39] As a threshold matter, the order cannot constitute Brady material because there is no indication in the record that the State possessed the order, nor is there any indication that the order was more accessible to the State than it was to Kelley's defense team. See Meros, 866 F.2d at 1309. Although the Massachusetts court sealed the grand jury's application for Sweet's immunity and the testimony he gave the grand jury about crimes in Massachusetts, the immunity order itself was a public document and thus available to Kelley's defense team. Although the State was not required to obtain a copy of the immunity order and turn it over to the defense, we demonstrate that the order lacked Brady materiality as a matter of law.

78

would have to infer that the court would have ignored the grand jury's request, which was based on the need for Sweet's testimony regarding several serious crimes. Put another way, we would have to infer that the court was more interested in helping the Florida authorities obtain Sweet's testimony than it was in honoring the grand jury's request. The counter-inference is far more likely: the court was so inclined to grant the grand jury's request that it gave Sweet transactional immunity rather than use immunity. In sum, the immunity order, standing alone, does not permit the inference that the prosecutor lied when he told the jury that the Massachusetts immunity order was not conditioned on Sweet's promise to testify against Kelley in Florida. Moreover, as will become clear from an examination of the Mitchell report, there can be no doubt that court did not grant Sweet immunity because he promised to testify for the State at Kelley's trial.

We turn now to the Mitchell report to see if it permits the inference that the prosecutor lied in his closing argument to the jury. The district court found that the State's "fail[ure] to disclose to defense counsel Agent Joe Mitchell's Florida Department of Law Enforcement Investigative Report dated February 21, 1981"[40] violated the Brady rule. Kelley, No. 92-14246 at 14 (S.D. Fla. Sept. 19, 2002).

---

[40] Although Mitchell's report was dated February 21, the report refers to events that occurred after that date. A notation appears at the bottom of the report indicating that it was dictated on March 23 and typed on May 6, 1981.

The report generally describes conferences that took place on February 21 and 23, March 6 and 12, 1981 concerning Kelley's and Sweet's criminal activities, including the Maxcy murder. Some of the conferences were held telephonically and some in person. All involved law enforcement authorities; Sweet was physically present on March 12.

According to Mitchell's report, on February 21, Rex Amistead, Director of the Regional Organized Crime Intelligence Center in Memphis, Tennessee, called Mitchell with the following information: Major John Regan of the Massachusetts State Police had informed him that the State Police were "conducting a major multi jurisdictional [sic] investigation involving organized crime activities in . . . Massachusetts and a witness whom they had in protective custody had provided information pertaining to [the Maxcy] murder." The witness was John Sweet. The information was that Maxcy had been killed in 1966 by William Kelley, "a . . . hit man" Sweet had hired. "Armistead emphasized that Major Regan . . . indicated that Sweet was willing to testify in behalf of the State of Florida [in the prosecution of Kelley for Maxcy's murder], providing he could be granted immunity . . . ." Mitchell was aware of the "the homicide . . . Sweet had been discussing with Major Regan" and told Director Armistead that Sweet had been indicted for Maxcy's murder, and that the victim's wife, Irene Maxcy, who

80

testified at Sweet's trial, had subsequently been charged with perjury and found guilty. Mitchell also told Armistead that he was unaware of the "disposition of Sweet's charges."

> According to . . . Armistead, Major Regan was requesting assistance from the [FDLE] in checking into the investigation of the homicide of von Maxcy, and the possibilities of using testimony by Sweet on charges against suspect William Kelley of the Boston area. Further, Major Regan advised that their department is scheduled to indict and charge suspect Kelley with a number of felonies . . . . It was felt that if the State of Florida could prosecute Kelley in th[e] 1966 homicide the State of Florida could make a stronger case against Kelley.

Mitchell advised Director Armistead that "Major Regan's request would relayed to the Director of the Division of Law Enforcement . . . to determine what action may be made by the [FDLE] in the case."

On February 23, following Director Frank Tassone's instructions, Mitchell informed the State Attorney of Major Regan's request for investigative assistance and Sweet's willingness to testify against Kelley in Florida provided that he be granted immunity there with respect to the Maxcy murder.

On March 6, several parties interested in Sweet's potential testimony met in the State Attorney's Office in Bartow, Florida. Attendants at the meeting included law enforcement officers, representatives of the State Attorney's office, the State Attorney who had prosecuted Sweet in 1967 (retired at the time of the meeting),

81

FDLE personnel (including the case agent in the Maxcy investigation), a Massachusetts district attorney, and Paul A. Cataldo (a Massachusetts lawyer who was "representing Sweet in the immunity for the State of Massachusetts cases"). "As a result of the meeting, it was agreed . . . that representatives from the State Attorney's Office . . . and the [FDLE] would proceed to Boston . . . and interview John Sweet for the full details in connection[] with the . . . Maxcy homicide . . . ."

On March 12, State Attorney Quillian Yancey, Assistant State Attorney Hardy Pickard, and Mitchell interviewed Sweet in the "Office of the District Attorney, New Bedford, Massachusetts." At the request of Sweet's attorney, Steve Rusconi, a young lawyer in Cataldo's office, the interviewers neither placed Sweet under oath nor tape recorded what he said. Mitchell's report summarizes what Sweet related, which is essentially what he testified to at Kelley's trial. Mitchell's summary of the information obtained from Sweet appears verbatim in the margin.[41]

---

[41] In relevant part, the report states:

[Sweet] admitted to his participation in the homicide of . . . Maxcy. He advised that initially has was engaged in conversation with the wife of . . . Maxcy, Irene Maxcy, who mentioned to him that she was in fear that Maxcy had intentions of divorcing her and cutting her out of any portion of the estate. After that, Irene Maxcy, discussed with him concerning doing away with . . . Maxcy, and she asked him to contact his friends in Boston, Massachusetts, to discuss the killing of her husband. Sweet further emphasized, based on the request of Irene Maxcy, he proceeded through a close associate of his, WALTER BENNETT, who hired VON ETTER white/male, (NFI) and WILLIAM

KELLEY, of the Boston, MA, area, to do the killing. Sweet further indicated, that Mrs. Maxcy, provided the finances to hire Walter Bennett, and he delivered Bennett a $5,000 fee in advance and later they traveled to Boston, Massachusetts, where he delivered the balance of $15,000 dollars personally to Walter Bennett, at a Howard Johnson's Motel parking lot, just south of Boson, Massachusetts.

Sweet indicated that after Bennett was given the $5,000 down payment, he sent Von Etter down to review the situation and Sweet met with him to show him the area and after that, they set up a prearranged date which would be suitable for the hit man to arrive and commit the murder. Further, Sweet indicated that on the day of the murder, Mrs. Maxcy left the doors unlocked to the house and Etter and Kelley drove to a shopping center parking lot, Sebring, Florida, where Sweet met them and drove them to the Maxcy house and dropped them to await Maxcy's arrival. At the time he dropped them at the house, they were in possession of a bag containing several knives and pistol's [sic] and after they were through with the assignment, they were scheduled to drive the victim's vehicle back to the shopping center where he had left their vehicle after he returned from the victim's house.

After the killing, Mrs. Maxcy took the money out of a trust account from an Orlando Bank to furnish to Sweet to be delivered to Walter Bennett in Massachusetts to pay the balance of the $20,000 payment.

A few months after the incident, Von Etter's body was found in the trunk of a[n] automobile in the Boston, Massachusetts, area, and also Sweet indicated that Walter Bennett and his brother were also missing from the area, and all intelligence revealed that they were both killed.

Sweet emphasized that he had known William Kelley a number of years, but did not see him for 3 years after the killing and advised that Kelley had been involved in the rackets associated closely with organized crime associates in the Boston, Massachusetts, area for many years. Sweet further indicated, that Kelley had recapped the scene of killing . . . Maxcy, and he advised that they had thrown a sheet over Maxcy's head when he arrived in his house and stabbed him four (4) times. The [sic] indicated Maxcy was a powerful man and they had to shoot him. Further, Mr. Sweet emphasized that Kelley had been continually involved in criminal activities and was suspected [to be] involved in several unsolved homicides, but had not been charged. Mr. Sweet emphasized that he had voluntarily come forth to the Massachusetts State Police and was agreeable to provide information pertaining to Kelley's current activities and also had agreed to testify against him. Sweet advised that he was agreeable to testify for the State of Florida, in connection[] with the . . . Maxcy homicide if the State proceeded

83

The district court, in concluding that the Mitchell report constituted exculpatory evidence, relied on the following passage in the report regarding Director Armistead's telephone conversation with Mitchell: "Mr. Armistead emphasized that Major Regan had indicated that Sweet was willing to testify in behalf of the State of Florida, providing he could be granted immunity in the 1966 case." The district court found this passage "vastly at odds with the state's representation [to the jury in closing argument] at the trial." Kelley, No. 92-14246 at 15 (S.D. Fla. Sept. 19, 2002). "During the State's closing argument, Pickard argued to the jury that Sweet did not have to give Kelley to the authorities in order to get immunity. However, it is clear from the withheld report that Sweet was willing to testify if he could be granted immunity." Id.

It is obvious to us that the district court was confusing the immunity granted Sweet in Florida with the immunity granted him in Massachusetts. The court also failed to realize that the Mitchell report discloses what Sweet wanted for testifying against Kelley, to-wit: Florida immunity. The report contains not a word about Sweet obtaining immunity from a Massachusetts court and what, if anything, he would have to do to obtain that immunity. What the Mitchell report has to say on

with charging William Kelley with the homicide.

84

the subject of immunity is that Sweet was willing to testify in a case brought against Kelley in Florida if Florida gave him immunity.  No statement attributed to Major Regan or anyone else in the Mitchell report yields a permissible inference that Sweet was willing to testify in Florida only if the Massachusetts court granted him transactional immunity with respect to the crimes the Massachusetts grand jury was investigating.  Finally, nothing in the Mitchell report even suggests, much less establishes circumstantially, that Pickard's comment to the jury—that Sweet did not have to agree to testify against Kelley in Florida to gain immunity in Massachusetts—was a lie.[42]  To the contrary, the record at hand leads inexorably to the fact that Pickard told the truth.

We move then to the district court's finding that the immunity order and the Mitchell report, if considered together, contained exculpatory evidence.  The district court was led to this finding because the Massachusetts court granted Sweet immunity on March 13, 1981, the day after the Florida officials interviewed Sweet.  The court's finding necessarily implies that there was a connection

---

[42]  The Mitchell report indicates that the Massachusetts grand jury was conducting a "major multi jurisdictional investigation involving organized crime activities in the State of Massachusetts."  The grand jury apparently considered both Sweet and Kelley as suspects.  Under the immunity the Massachusetts court granted Sweet, he might be asked questions that would implicate Kelley.  If he refused, the court could hold him in civil contempt—whether or not he had told the court, when it granted him immunity, that he was willing to testify against Kelley.

between the grant of immunity and the interview. In the district court's mind, the connection was this: the Massachusetts court was not going to grant Sweet immunity unless the Florida officials reported that Sweet had given them what they needed. In other words, the Massachusetts court was prepared to deprive the grand jury of Sweet's testimony about widespread criminal activity in Massachusetts unless Sweet agreed to testify against Kelley in Florida if the Highlands County grand jury indicted Kelley for the Maxcy murder (which it eventually did occur on December 16, 1981). Such an implication strains credulity. Sweet was in protective custody because those he could incriminate wanted him silenced. The grand jury needed his testimony and asked the court to grant him immunity. The notion that the court granted Sweet immunity because some Florida officials in effect gave the court the go-ahead sign is preposterous.

The Rule 3.850 court and, later, the Florida Supreme Court also examined the Mitchell report and the immunity order. The supreme court explicitly found that there was "no evidence to support the inference that Sweet's Massachusetts immunity was contingent upon his testimony in the defendant's Florida trial." Kelley, 569 So. 2d at 758. As we have shown at length, this state-court factfinding is more than "fairly supported by the record." As such, it is entitled to our deference. Purkett v. Elem, 514 U.S. 765, 769, 115 S. Ct. 1769, 1771, 131 L.

86

Ed. 2d 834 (1995) ("In habeas proceedings in federal courts, the factual findings of state courts are presumed to be correct, and may be set aside, absent procedural error, only if they are 'not fairly supported by the record.'" (quoting pre-AEDPA 28 U.S.C. § 2254(d)(8))). Since the district court's implicit finding that Sweet had to testify against Kelley in Florida to gain immunity in Massachusetts cannot be squared with the deference due to the state court's finding, we must reject it. And as that finding crumbles, so too does the district court's conclusion that Mitchell's report could have affected the result of Kelley's trial.

Because the record cannot support the finding that Pickard lied to the jury during the State's closing argument, it is clear that information about Sweet's immunity was valuable only for the purpose of impeaching Sweet's credibility as a witness. It bears emphasis that Kelley's defense, despite its lack of the immunity order and the Mitchell report, was neither deprived of nor forwent any opportunities to discredit Sweet by discussing the scope of his Massachusetts immunity. While the application to the Massachusetts court for Sweet's immunity and Sweet's resulting testimony were sealed, Kelley's defense learned a great deal about Sweet's immunity from the transcript of a Massachusetts criminal trial at which Sweet testified at length. Jack Edmund used this transcript to cross-examine Sweet thoroughly about his immunity in Massachusetts. For example,

87

Edmund succeeded in getting Sweet to admit that he testified numerous times for Robert Kane, an assistant district attorney for Bristol County. Sweet went on to acknowledge that he received immunity for every offense he discussed with Kane and other Massachusetts prosecutors. Edmund then catalogued a litany of crimes for which the Massachusetts court, in the order it entered on March 13, 1981, had granted Sweet immunity. Among these, Sweet admitted to receiving immunity for loan sharking, hijacking, drug violations, larceny, arson, bribing a police officer, participating as an intermediary in a bookkeeping operation, making false reports to police officers, and counterfeiting. Sweet also acknowledged that the state of Massachusetts agreed not to prosecute him for his involvement in "manag[ing]" prostitution, although he quibbled as to whether a state court had given effect to the understanding in a formal immunity order.

Edmund also cross-examined Sweet about his immunity in Florida:

Q:    Mr. Sweet, you received immunity for first degree murder in Florida, didn't you, sir? That is the killing of Von Maxcy; right? Is that a fair statement?
A:    Yes, sir.

Responding to subsequent questions, Sweet proceeded to admit that he also received immunity for the perjury he committed in both of his own Florida trials. The Mitchell report's indication that Sweet wanted immunity in Florida in

88

exchange for testimony there could not have added to Sweet's bald admissions regarding his Florida immunity.

Finally, despite the disadvantages Kelley's federal habeas counsel claim Kelley suffered because the State failed to give his trial attorneys copies of the immunity order and the Mitchell report, his trial attorneys proved themselves readily able to seize every opportunity to use information about Sweet's immunity in Massachusetts and Florida in their first and last closing arguments to the jury at the close of Kelley's trial. In his opening argument, Kunstler lamented to the jury that Sweet "comes down here and he gets immunity for murder and perjury." Edmund, in his closing argument, roughly paralleled Sweet's various immunities to transgressions of the Ten Commandments:

> [Sweet] has immunity for first degree murder. Thou shalt not kill.
> He has immunity for perjury in that first degree murder trial. Thou shall not bear false witness.
> He has immunity for larceny. Thou shalt not steal.
> He wasn't prosecuted for adultery. Thou shalt not commit adultery.
> He won't be prosecuted for stealing Mrs. Irene Maxcy away from her husband. Thou shalt not covet thy neighbor's wife.
> He will not be prosecuted for taking Von Maxcy's estate money. Thou shalt not covet thy neighbor's goods.
> Nor will he be prosecuted for loan sharking. Thou shalt not break thy neighbor's head.
> He will not be prosecuted for breaking and entering, nor shall he be prosecuted for the prostitution, the narcotics, the bribery, the falsely reporting a crime or counterfeiting.
> Make your message to the State of Florida ring out loud and clear . . .

89

prosecute him for lying about that man [Kelley] and send [Sweet] where he justly belongs.

At the end of the day, the defense counsel's purpose for wanting to exploit Sweet's immunity arrangements was to convince the jury that Sweet was a sullied witness. There can be no doubt on this record that counsel succeeded without the Massachusetts immunity order and the Mitchell report. If introduced into evidence as part of Kelley's defense, these two exhibits would have constituted, at best, cumulative evidence. See Routly v. Singletary, 33 F.3d 1279, 1286 (11th Cir. 1994) (holding that no prejudice resulted from state's failure to supply the defense with a witness's immunity agreement and related documents where defense counsel alerted the jury to the witness's immunity and potential bias through cross-examination, rendering the disputed evidence no more than "cumulative impeachment" of the witness). At worst, the exhibits—especially the Mitchell report—would have been highly prejudicial to Kelley. Recall that the report revealed that the Massachusetts grand jury was conducting a multi-jurisdictional "investigation involving organized crime activities in the State of Massachusetts," and that the State Police wanted Kelley indicted for "a number of felonies."[43] We do not hesitate to conclude that the State's withholding of the

---

[43] We have not overlooked the possibility that defense counsel would have chosen not to admit the Mitchell report into evidence, electing instead to call Mitchell to the witness stand.

immunity order and the Mitchell report did not violate the <u>Brady</u> rule.

> b.      Transcript of John Sweet's First Trial

The State Attorney in office at the time of Sweet's prosecution, in 1967 and 1968, was Glenn Darty.  The State Attorney in office at the time of Kelley's prosecution in 1983, sixteen years later, was Quillian Yancey.  Assistant State Attorney Harding Pickard handled Kelley's prosecution for Yancey.

Prior to Kelley's first trial, defense counsel, recognizing that Sweet would be the State's star witness, made a discovery request that Pickard produce the transcripts of both of Sweet's trials.  Pickard turned over the transcript of Sweet's second trial, the trial that resulted in Sweet's conviction.  But he did not produce the transcript of Sweet's first trial, which resulted in a hung jury and a mistrial.  He apparently thought that a transcript had not been prepared.

In responding to Kelley's Rule 3.850 motion in January 1988, the Florida Attorney General's office, which represents the State in Rule 3.850 proceedings in capital cases, produced transcripts of portions of Sweet's first trial.  The record does not contain or even suggest the answer to the question of whether State Attorney Yancey's office had the transcript of Sweet's first trial in its possession

---

Depending on how far counsel opened the door on direct-examination, the State might be able on cross to explore Kelley's criminal activities in Massachusetts.

at the time of Kelley's discovery request.  The answer, however, is not important.  The transcript is legally immaterial because Kelley's attorneys had available to them during both of Kelley's trials the entire transcript of Sweet's second trial, and that transcript contained the essence of Sweet's testimony at his first trial.

In reaching the opposite conclusion, the district court pointed to two pieces of information that were contained in the first transcript but not the second.  First, the undisclosed transcript shows that Sweet testified about Irene Maxcy's sexual deviance, including allegations that she engaged in bestiality.  Although Irene Maxcy did not testify at Kelley's trial, Kelley's Rule 3.850 counsel posited—and federal habeas counsel do so now—that this testimony about her would have been valuable in impeaching Sweet.  This testimony demonstrates that Sweet was willing to testify to anything that would further his interests.

What Sweet said about Irene Maxcy's sexual deviancy is immaterial primarily because the Florida Supreme Court, in reviewing the Rule 3.850 court's denial of relief, concluded that evidence of her alleged deviancy would not have been admissible at Kelley's trial.  Kelley, 569 So. 2d at 757.  Thus, its unavailability could not have affected the result of the case so as to create prejudice.  A reasonable probability of a different result is possible only if the suppressed information is itself admissible evidence or would have led to

92

admissible evidence. Spaziano v. Singletary, 36 F.3d 1028, 1044 (1994).

Furthermore, the Rule 3.850 court explicitly found that Kelley's "defense counsel

w[ere] aware of the allegations concerning Mrs. Maxcy." Kelley, 569 So. 2d at

757. Again, we must defer to this finding of fact because the record supports it.

See Purkett, 514 U.S. at 769, 115 S. Ct. at 1771.[44] Both of Kelley's defense

attorney's indicated some knowledge of these allegations at the Rule 3.850

hearing. Finally, this highly inflammatory testimony about Irene Maxcy, who did

not testify at Kelley's trial, could not have been more useful to show Sweet's

willingness to lie at trial than Sweet's own, unequivocal testimony that he

committed perjury repeatedly in both of his trials.[45] Armed with this admission,

---

[44] Moreover, nothing in the federal habeas proceeding contradicts the finding.

[45] At Kelley's second trial, for example, Sweet testified as follows on cross-examination:

Q:    I am talking about the number of lies.  Would they be in the hundreds of
      lies that you have told under oath, Mr. Sweet?
A:    Well, it would be both trials.  I'm sure it was—
Q:    It was question after question after question in your first trial that you lied
      about, wasn't there, sir?
A:    Yes, sir.
Q:    And you were under oath?
A:    Yes, sir.
Q:    And you raised your hand to swear to God to tell the truth, the whole truth,
      just like you did today?
A:    Yes.
Q:    And you lied?
A:    Yes, sir.
Q:    You lied to save your life?
A:    Yes, sir.

defense counsel had little to gain by exploiting the perverted allegations in Sweet's first trial transcript.

Second, the undisclosed first-trial transcript reveals that the jury heard recorded phone conversations between Sweet and Irene Maxcy. During these conversations, Sweet stated that he did not know anyone named "William Kelley." The transcript also reveals that Sweet testified that he believed Irene Maxcy's assurances that she was not tape recording their conversations.

Sweet's denial of knowing Kelley might seem critical in a vacuum, but the force of that denial is eroded almost entirely by Sweet's admission that, after the murder, he routinely denied any knowledge of or involvement with Kelley. For instance, at Kelley's second trial, Edmund elicited the following testimony from Sweet on cross-examination:

> Q: During your first trial you denied knowing Bill Kelley, didn't you?
> A: I did.
> Q: When you were talking to the investigators prior to your first trial, you denied knowing Bill Kelley, didn't you?
> A: I did.
> Q: During you second trial you denied knowing Bill Kelley, didn't you?
> A: I did.
> . . .
> Q: When Bill Kelley beat you up and you went to the hospital, you even lied to the hospital about how it happened, didn't you?
> A: I did.

. . .

Q: Could you estimate for this Jury how many lies you have told under oath, sir, over the period of the last seventeen and a half or eighteen years?

A: Well, since I have known Bill Kelley, any involvement there, I have lied about knowing the man.

Sweet's recorded conversations with Irene Maxcy transpired after the murder, when Sweet, according to his own testimony, had commenced lying about knowing Kelley. The phone conversations simply corroborate Sweet's testimony about this pattern of denial.

Even without a transcript of the testimony Sweet gave at his first trial, defense counsel were able to take advantage of Sweet's specific admission that he had denied knowing Kelley. For example, in his opening argument to the jury, Kunstler said,

[John Sweet] committed perjury twice down here. He took the same oath. He is saying to you, believe me now. I am being good now. I am going to tell you all the truth. But he told two other juries total lies. He told them he had nothing to do with the murder, he knew nothing about it, he didn't know Kelley.

Consequently, there can be no reasonable probability that the availability of a transcript of Sweet's first-trial testimony could have affected the outcome of Kelley's trial.

c. Roma Trulock Report

95

Kaye Carter lived at the Daytona Inn Motel at the time of the murder; her parents were the motel's managers. The prosecution theorized that both of triggermen, Kelley and Von Etter, roomed at the Daytona Inn Motel before driving down to Sebring to murder Maxcy. In fact, the motel's records from that time reflect guests registered as "Mr. and Mrs. William Kelley." Carter, who was only seventeen when the murder occurred, testified that she met Von Etter, the man registered as Kelley, and two females traveling with the men. Carter claims she had dinner with Kelley and the others on October 3, 1966, the very evening Maxcy was slain. Through this association, Carter became familiar with Kelley's appearance.

Special Agent Roma Trulock of the FDLE interviewed Carter on March 17, 1967 and obtained a description of the man Carter knew as Kelley at the motel. Trulock then summarized Carter's one-time description of Kelley in two different investigative reports: one dated March 17, 1967, the second dated March 18, 1967. Although defense counsel acquired Trulock's first report, the State never produced the second the report.

The district court found that the "suppression of the [second] report violated Kelley's constitution [sic] right and prejudiced his defense." Kelley, No. 92-14246 at 22 (S.D. Fla. Sept. 19, 2002). In the court's view, distinctions in

Trulock's reports regarding Carter's description of Kelley rendered both reports material to Kelley's defense.  The court compared the documents as follows: According to Trulock's first report, which was dated March 17, 1967 and <u>was disclosed</u> to the defense, Carter described the person she knew as Kelley "as being about 40, 6' to 6' 2" tall, medium build, dark hair, (kind of curly) with a deep husky voice"; according to Trulock's second report, which was dated March 18, 1967 and <u>was not disclosed</u> to the defense, Carter described Kelley "as being about 40, 6' medium build, dark hair, kind of curly, husky voice."  Additionally, the second report, but not the first, contains Trulock's following reflection about Carter's identification: "This picture of William Harold Kelley looks something like him although she is sure that he was older than the 26 years on his description." <u>Id.</u> at 20.

The district court offered three reasons why the second report was materially exculpatory, even though the defense had the first report.  First, it argued, the two-inch height discrepancy between the reports was critical because Kelley, in fact, stood at about 6' 5".  Second, the notation that Carter was "sure" that Kelley was older than twenty-six was material because Kelley was only twenty-three on the night of the murder.  And third, the notation that Carter thought the picture presented by Trulock looked "something like" Kelley revealed

97

her uncertainty and, perhaps, constituted a negative identification.

To be sure, the defense was entitled to at least one of these reports. Both reflect similar descriptions by Carter that differ considerably from Kelley's actual appearance at the time of the murder. Ostensibly, Kelley was twenty-three and youthful in appearance. He had straight blond hair and stood well over 6'. Both of Trulock's reports suggest that Carter thought the man identified as Kelley at the motel was shorter, much older, and had dark curly hair.

This conflicting description was important to Kelley's defense, and counsel ensured that the jury knew that. As noted above, defense counsel had the benefit of delivering the first and last closing arguments to the jury because they elected not to present a case. In the first argument, Kunstler cast Carter as a truly objective witness, one who has "absolutely nothing to gain or lose by this case." He emphasized that the State never asked Carter to identify Kelley at trial, and he argued that at least some aspects of Kelley's appearance, such as his height, should not have changed so much over the years since the murder that Carter should have been unable do so if the defendant Kelley and the man Daytona Inn Motel were in fact one in the same. Defense counsel underscored these troubling inconsistencies time and again at Kelley's trial. "You have to decide whether the man having the name William Kelley," Kunstler reasoned to the jury, "was a

98

twenty-three year old . . . six foot six man with blondish hair or a forty-year-old man with medium build and dark curly hair and four inches shorter than Mr. Kelley is.  That testimony is very significant."  In his closing argument, Edmund poignantly directed Kelley to stand so that the jury could observe him.  "I'll ask him to stand up," Edmund explained, "because the man who registered into the Daytona Beach Inn over there was a man who has been described by the only person who's testified in this court to describe that individual as being forty years old . . . six foot to six foot two inches tall with black curly hair."

Acknowledging the tremendous import of Carter's description, we cannot agree that the differences between Trulock's two reports were so significant that defense counsel needed both reports to argue Kelley's case to the jury effectively.  Every significant aspect of Carter's description was reflected in both reports.  We need not decide whether a two-inch difference in Kelley's height estimates could be material because the reports reflect no such inconsistency.  Rather than an incongruent height estimate, the first report simply reflects a two-inch range, i.e., 6' to 6' 2", the bottom end of which is identical to the height estimate noted in Trulock's second report.  Furthermore, the record indicates that the two reports were based on a single interview with Carter.  After all, the reports were dated one day after the next, and the Florida Supreme Court characterized the second,

nondisclosed report as a summary of the "original full report," which was disclosed to the defense. Kelley, 569 So. 2d at 757-58.[46] This fact suggests that the discrepancy in descriptions, if any real discrepancy exists, reflects a variation in Trulock's characterization, not a variation in Carter's identification. Thus, the contention that the second report makes Carter's identification less believable because it shows that she understated Kelley's height by five inches, rather than three to five inches, would be easily rebutted by reference to the first report, which reflects the very same interview and description.

Carter's indication that she was "sure" that Kelley was older than twenty-six certainly could not complement the defense's arsenal beyond the firepower provided by the disclosed report. After all, the disclosed report indicated more specifically and in no uncertain terms that Carter estimated Kelley to be forty years of age at the time of the murder.

---

[46] Trulock interviewed Carter twice, once on March 17, and once March 20. But in both reports, Carter's description of Kelley clearly derives from the March 17 interview alone. The second report, which was not provided to defense counsel, was completed prior to the March 20 interview and thus reflects the March 17 meeting only.

Trulock's first report, which was disclosed, reflects comments from both interviews. Comments about the second interview appear in a short addendum dated March 20, 1967. The addendum provides no additional description of Kelley's physical features. In fact, it reflects nothing more than Carter's statement that "the unknown couple" accompanying Von Etter at the Daytona Inn Motel was registered at the motel "under the name of William Kelley." In sum, the reports summarized the very same interview with respect to Carter's description of Kelley; to the extent the varied in other regards, the disclosed report was more comprehensive than the undisclosed report.

Finally, Carter's qualification that Trulock's picture of Kelley looked "something like" the man registered under that name at the motel is of no material consequence. The problems with Carter's identification were far more forcefully illustrated by her specific descriptions of a man at the motel who differed in appearance from Kelley. Defense counsel took full advantage of these inconsistencies. They would not have wanted to cross-examine Carter about the photo identification she gave Trulock. Why? Because counsel knew that the State was armed with a transcript of what Carter told the jury at Sweet's second trial—that the photograph the prosecutor was showing her was the photograph of the man named "Kelley" she met at the motel the day of the Maxcy murder. She was right: the photograph was of Kelley. Kelley, 569 So. 2d at 758. Defense counsel would not have wanted to risk the possibility that the State, on redirect, would ask Carter if she had identified a photograph of the man named "Kelley."

Ultimately, the State's provision of Trulock's first report rendered any omission of the second report perfectly harmless.

d.    Fingerprint Report

In the course of investigating the Maxcy murder, the Highlands County Sheriff received a "Latent Fingerprint Report," dated September 1, 1967, from the Florida Sheriffs Bureau. The report reflects that forty-eight latent finger and palm

101

print lifts were taken from Maxcy's house and car. The report further states that the lifts were compared against the finger and palm prints of eighty-one persons, including Kelley, and that none of the lifts positively matched Kelley's prints. This report was not supplied to defense counsel.

Nevertheless, defense counsel were well aware at trial that Deputy Sheriff J.C. Murdock, a prosecution witness, had lifted several latent prints from the crime scene and sent them to the Florida Sheriffs Bureau and that none of the prints matched Kelley's.[47] Capitalizing on this knowledge, Kunstler cross-examined Murdock on this point extensively.

> Q:   [C]an you tell the Jury what was done about fingerprints?
> A:   Well, [another officer] and I lifted fingerprints in the building and also from the car. They were sent to Tallahassee Bureau of Law Enforcement for processing.
> Q:   How many fingerprints did you find in the house?
> A:   I have no idea?
> Q:   Can you remember where you found them?
> A:   Yes, sir. We lifted prints out of the hallway, I believe, where [Maxcy's] wallet and keys and stuff were laying on the chest of drawers there. But I have no idea how many.
> Q:   What about the front door handle, for example?
> A:   We probably did. I don't remember the front door handle. . . . We probably did.
> Q:   I take it you dusted inside the house wherever you thought would be a likely place?
> A:   Yes, sir.

---

[47] As the Rule 3.850 court found, and the Florida Supreme Court agreed, "The results of the fingerprint report were known to the defense and utilized at trial." Kelley, 569 So. 2d at 758.

Q:     Would that also be true of Mr. Maxcy's car?
A:     Yes, sir.
Q:     And with reference to the car, do you have any idea as you are sitting there—I know you are trying to think back eighteen years—do you have any idea how many fingerprints you lifted from the car?
A:     I don't know, no, sir.  There was quite a few.
Q:     When you took fingerprints from the car and home, was it by dusting?
A:     Yes, sir.
Q:     That is the test that brings out a latent fingerprint?
A:     Yes, sir.
Q:     Latent[] is a print you can't see with the naked eye?
A:     Right.
Q:     When you got these prints, you took them off with a sticky tape, did you not?
A:     Yes, sir.
Q:     Where did you send them?
A:     They were labeled with the location where they were taken and sent to Tallahassee.
Q:     Did you ever get a report?
A:     No, sir.
Q:     As you sit there, do you know whose fingerprints you found?
A:     To my knowledge, no, I don't.  After they left here I have no idea.
Q:     But you know you did not received any information about any fingerprints of Mr. Kelley being found?
A:     To my knowledge, no.

Kunstler later emphasized this in closing argument to the jury:

J.C. Murdock was then the deputy sheriff, and he took a lot of photographs.  He lifted fingerprints, as I remember, fingerprints from Von Maxcy's car, fingerprints from the house.  You know none of those prints were identified as Mr. Kelley's prints at all. . . .  We don't know whose prints they were, they never told us, but we know they were not Mr. Kelley's prints.  There were no prints of his in this

103

whole situation.

The district court concluded that the fingerprint report was <u>Brady</u> material despite defense counsel's knowledge of the report's results. The court reasoned, "commenting that Kelley's fingerprints were nowhere to be found in the criminal investigation is not the same as being able to present a report to the jury stating such an absence of Kelley's prints." <u>Kelley</u>, No. 92-14246 at 22 (S.D. Fla. Sept. 19, 2002). We infer from this statement that the district court thought that Kelley was prejudiced by his attorneys' inability to introduce the report into evidence; that is, without the report, the jury might have disregarded the comments Kunstler made in closing argument and erroneously concluded that Kelley's prints had been found at the scene of the murder.

Of course, to have drawn such a conclusion, the jury would have had to disregard not only Kunstler's comments, but also Murdock's testimony and the fact that the State did not dispute the assertion that none of the latent finger and palm prints were Kelley's.[48] In our view, no reasonable jury would have needed the contents of the report to accept Murdock's unimpeached testimony and Kunstler's unrebutted statement that Kelley's prints were not among those lifted

---

[48] Kunstler made the first argument for the defense. The prosecutor went next. Nothing the prosecutor said to the jury would have caused it to believe that Kelley's prints were among those Murdock and the other officer had obtained.

from the crime scene. Kunstler and Edmund must have harbored the same view. If they thought there was even the slightest chance that the jury might err, surely they would have demanded a copy of the report before cross-examining Murdock. But they made no such demand.

We also doubt the district court's implicit assumption that defense counsel would have introduced the report into evidence if it were available. If it were armed with the report, defense counsel could have tried to introduce it into evidence either: (1) in the State's case-in-chief, through the cross-examination of a prosecution witness; or (2) in Kelley's defense, after the State rested. Counsel could not, however, have introduced the report in this case through the cross-examination because none of the prosecution witnesses, including Murdock, ever saw it. Consequently, defense counsel would have had to place the report in evidence in Kelley's case.[49] In other words, instead of resting without presenting any evidence, Kelley would have had to call a witness to the stand to identify the report. By putting the report in evidence, Kelley would have deprived himself of the right to make the first and last closing argument to the jury.[50] We are not

---

[49] The report would have been admissible in evidence pursuant to Fla. R. Evid. 90.955, "Public Records."

[50] "[O]rdinarily, the introduction of documentary evidence by a defendant forfeits his right to make the concluding argument." Gari v. State, 364 So. 2d 766, 767 (Fla. 2d Dist. Ct. App. 1978).

convinced that defense counsel would have forfeited this privilege to introduce cumulative evidence of a fact that the State did not dispute.

The district court suggests that if defense counsel had been given the finger and palm prints Murdock sent to the Florida Sheriffs Bureau, counsel could have had a forensics expert determine whose prints had been found. The court put it this way:

> Defense counsel's possession of the actual fingerprint report would have enabled them to make inquiries as to the comparisons of the latent lifts to other suspects. Thus, all of the information in the fingerprint report would have been material and exculpatory and the fingerprint report could have been used to "finger" another suspect.

Kelley, No. 92-14246 at 23-24 (S.D. Fla. Sept. 19, 2002). The problem with the district court's suggestion is that it confuses the latent fingerprint report with the finger and palm print lifts themselves. The report reflects only a written summary of forensic research; it contains no lifts and thus no means of comparing prints found at the crime scene to the prints of other suspects. The State's nondisclosure of the report, as distinguished from the lifts, was the basis for Kelley's Brady claim. Because Kelley never succeeded in obtaining the lifts, he did not assert that they were withheld in violation of Brady. Instead, he assumed that they were destroyed or otherwise unavailable. Kelley's 3.850 motion and habeas petition both asserted that the unavailability of the finger and palm print lifts deprived him

106

of due process guaranteed by the Fourteenth Amendment,[51] but the Rule 3.850

courts and the district court rejected this argument. As the district court explained,

"Kelley fails to establish any animus on the part of law enforcement in their

destruction of the evidence. Therefore, Kelley's Petition for Writ of Habeas

Corpus as to Claim 3, destruction of evidence, is DENIED." Kelley, No. 92-

14246 at 11 (S.D. Fla. Dec. 30, 2002). In sum, the district court confused the

report with the lifts themselves, and this error led the court to grant habeas relief

for a claim it squarely denied. Accordingly, we disregard this aspect of the court's

Brady ruling.

Finally, we must note, as did the Florida Supreme Court, Kelley, 569 So. 2d

at 757, that the absence of Kelley's fingerprints is entirely consistent with the

State's theory of the case. Sweet testified that Kelley had a glove on one hand.

This testimony reinforces our conclusion that the absence of the fingerprint report,

the results of which were known to defense counsel and argued to the jury

anyway, was immaterial.

In sum, although the fingerprint report contained exculpatory information,

the State obviously revealed that information to defense counsel. Defense counsel

---

[51] This argument appears as part of claim (1) in Kelley's 3.850 motion and claim (3) in his federal habeas petition.

107

did not ask for a copy of the report during trial, and the State did not give them one. Under these circumstances, it is a close question whether the Brady rule required the State to provide the report to defense counsel, but even if it did, the record reflects no prejudice that merits habeas relief. Kelley could have suffered prejudice only if (1) the jury found Kelley guilty, in part, because it believed his prints were found at the scene of the crime; (2) defense counsel would have introduced the report into evidence had it been available; and (3) introduction of the report would have created a reasonable probability that the jury would not find Kelley guilty. We are satisfied that the jury's verdict was not tainted in that way, and we doubt that the report would have been introduced into evidence; hence, the withholding of the report did not affect the outcome of the trial.

3.    Conclusion Regarding Brady Claims

Whether or not the five items the district court identified should have been disclosed to defense counsel, their effect taken individually and cumulatively could not have been legally significant to the outcome of Kelley's trial. As explained at length above, defense counsel effectively capitalized—in one way or another—on every potentially valuable argument the five items support, even though the items themselves were unavailable to counsel at the time of trial. It follows in this instance that the pretrial disclosure of the items would not have

created a "reasonable probability that . . . the result of the proceeding would have been different." Bagley, 473 U.S. at 682, 105 S. Ct. at 3383. Thus, although the State ultimately prevailed in a factually challenging case, Kelley's due process rights were not offended.

## V.
## Conclusion

We acknowledge that this is an extraordinary case. The defendant was sentenced to death for a crime committed nearly four decades ago. The State's key witness was a reprehensible villain who literally got away with murder. Kelley's trial team included, among very capable and prominent attorneys, a disgraced and incompetent scoundrel. Notwithstanding these facts, however, our careful consideration of the law and the record demonstrates that Kelley received a full and fair trial. As he has suffered no denial of his constitutional rights, the law requires that his conviction and sentence must stand. Consequently, we reverse the district court's decisions—that Kelley received ineffective assistance of counsel and that the State violated the Brady rule—and the court's judgment granting the writ of habeas corpus.

SO ORDERED.